# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Brown*, 2013 IL App (2d) 110303

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS A. BROWN, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0303 |
| Filed | February 11, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated criminal sexual assault based on committing an act of sexual penetration knowing the victim, his girlfriend, was unable to understand the act or was unable to give knowing consent was upheld over his contentions that the State failed to prove those elements, since defendant admitted he used force against her that caused her death, a rational trier of fact could have concluded that the severe beating deprived the victim of the ability to give knowing consent, there was no "implied consent," and the evidence supported the jury's verdict. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 09-CF-609; the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Thomas A. Lilien and Jaime L. Montgomery, both of State Appellate
Defender's Office, of Elgin, for appellant.

Louis A. Bianchi, State's Attorney, of Woodstock (Lawrence M. Bauer
and Edward R. Psenicka, both of State's Attorneys Appellate
Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1      Following a jury trial, defendant, Thomas A. Brown, was convicted of involuntary manslaughter (720 ILCS 5/9-3(a) (West 2008)) and aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2008)) (predicated upon criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 2008)). He was sentenced to consecutive imprisonment terms of 5 years and 18 years, respectively. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of aggravated criminal sexual assault. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was charged by indictment with four counts of first-degree murder and one count of aggravated criminal sexual assault in connection with the June 9, 2009, beating death of V.W. In counts I and II the State alleged that defendant committed first-degree murder by knowing that his "acts created a strong probability of death or great bodily harm," in violation of section 9-1(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(2) (West 2008)). The counts were identical, except that count II added an allegation that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, in violation of section 5-5-3.2(b)(2) of the Unified Code of Corrections. 730 ILCS 5/5-5-3.2(b)(2) (West 2008).

¶ 4      In counts III and IV the State charged defendant with first-degree murder in that he caused the death of V.W. during the commission of a forcible felony, aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2008)), in violation of section 9-1(a)(3) of the Code. 720 ILCS 5/9-1(a)(3) (West 2008). Counts III and IV were also identical, except that in count IV the State again alleged the "exceptionally brutal or heinous" aggravating factor, under section 5-5-3.2(b)(2) of the Unified Code of Corrections. 730 ILCS 5/5-5-3.2(b)(2) (West 2008). In count V, which is the subject of this appeal, the State alleged that defendant committed aggravated criminal sexual assault in violation of section 12-14(a)(2) of the Code

in that he, "while committing a criminal sexual assault, *** knowingly placed his penis in the vagina of V.W. knowing that V.W. could not give consent and during the act caused bodily harm to V.W."

¶ 5        On the day of trial the State nol-prossed counts III and IV. Defendant withdrew his defense of self-defense as to the first-degree murder charges and requested an instruction on the lesser offense of involuntary manslaughter, which was given without objection. Because defendant challenges the sufficiency of the evidence against him, a detailed summary of the evidence presented at trial is necessary.

¶ 6        The record reflects that defendant lived alone in a house he rented in Wonder Lake, Illinois. On the morning of June 9, 2009, at around 6 a.m., police and paramedics responded to a 911 call placed by defendant. Once they arrived at his home, defendant directed emergency personnel to a bedroom, where they found the victim, V.W., lying on the floor covered by a blanket. V.W. had been badly beaten about the head and body and was naked from the waist down. She was not breathing and she had no pulse. There was vomit present beside her and on the bed next to her. The bed was wet, indicating that V.W. had urinated. Efforts to revive V.W. were unsuccessful. There was no electrical activity found in her heart.

¶ 7        V.W.'s estranged husband, K.W., testified that he met V.W. while visiting the Philippines in 2001. The couple married in 2002 and had a son who was six years old at the time of the trial. K.W. and V.W. lived with their son in West Allis, Wisconsin, until May 2009, when V.W. filed for divorce and moved out of the marital home to live with defendant in Wonder Lake. V.W. would continue to visit the home so she could see her son. K.W. testified that he learned V.W. had a relationship with defendant and that he met defendant once when V.W. and defendant traveled to Wisconsin to visit V.W.'s son and take him to a sporting event.

¶ 8        K.W. testified that on June 8, 2009, V.W. visited her son in Wisconsin. After the visit, she left around 12:30 p.m. in a red Ford Focus. About 30 minutes later, K.W. received a telephone call from defendant, who was looking for V.W. K.W. told defendant that V.W. had already left. When defendant asked him where V.W. had gone, K.W. told defendant that he did not know her whereabouts.

¶ 9        Later that day V.W. returned to K.W.'s home and asked if she could come in to use the restroom. K.W. told her "no" but went outside to speak to V.W. for about five minutes. V.W. wanted to see her son again, but K.W. told her that the child was sleeping. According to K.W., V.W. did not exhibit any signs of using drugs or alcohol. She also had no injuries and did not complain of being hurt.

¶ 10        V.W. left K.W.'s home, and about 10:30 p.m. defendant called K.W. again. K.W. said that during the conversation defendant referred to V.W. as a "filthy whore" or "Asian slut." K.W. thought that defendant had been drinking, but he could understand defendant's speech. During the conversation defendant used "swear words" to describe V.W. On cross-examination, K.W. said that V.W. had been unfaithful to him and that she was doing the same thing to defendant. K.W. also said that when defendant called at 10:30 p.m., he told K.W. that he hoped V.W. did not come back to his home. V.W. did not tell K.W. where she was going when she left his house the second time that day.

¶ 11    The first police officer to speak to defendant was Deputy Calilyn Kelly of the McHenry County sheriff's office, who arrived at defendant's home in response to the 911 call. Kelly testified that when she arrived at defendant's home he was standing in the bedroom talking on his cell phone as paramedics worked on V.W. Kelly described defendant as very upset and speaking frantically. Defendant accompanied Kelly to the kitchen. Kelly asked defendant what had occurred and why defendant called 911. Defendant told Kelly that he awoke at 5:30 a.m. and went to the kitchen and had a beer. Defendant told Kelly that he then went back into the bedroom to wake V.W. Defendant said that he observed a thick drool coming down from V.W.'s nose and mouth. Defendant told Kelly that V.W. was unresponsive. He said he poked and shook V.W. a little bit and then called 911. Other officers arrived and Kelly's conversation with defendant ended.

¶ 12    Deputy Michael Urgo testified that he arrived at defendant's home at approximately 6:10 a.m. on July 9, 2009. He was in the kitchen with Kelly and Deputy Christopher Marvel, also of the McHenry County sheriff's office. Defendant was drinking a beer and speaking to the deputies. Urgo took over the interview. Defendant told Urgo that V.W. was his girlfriend. He said that, the day before, V.W. mentioned that she was going to visit her ex-husband or soon-to-be ex-husband and her son in Wisconsin. Defendant told Urgo that he expected V.W. to be back by 5:30 p.m. and that at 2:30 p.m. he placed a call to V.W.'s ex-husband, who told defendant that V.W. had been at his home but had been gone for awhile. Defendant said that V.W. did not return home until hours later and that he did not want her in his home any longer. Defendant said that he had locked her out of the residence. After V.W. returned, a verbal argument started through an open window. Defendant let V.W. inside, where the argument continued and eventually turned physical. When the physical argument subsided, he and V.W. had intercourse and then went to bed. Defendant said that he woke up to let the dog out. After he returned to the bedroom he noticed vomit and that V.W. was unresponsive, so he called the police.

¶ 13    Urgo next interviewed defendant's neighbor, Henry Mertz. Mertz testified that around 5:45 a.m. that morning he saw defendant leave his home, enter V.W.'s red vehicle, and leave the area. Mertz stated that the emergency vehicles arrived at defendant's home 10 to 20 minutes after defendant left and that by that time the red vehicle was back and parked in defendant's driveway. After speaking to Mertz, Urgo interviewed defendant again. Defendant told Urgo that when he woke up he found V.W. unresponsive. He then left the residence and went to get cigarettes. When he returned he again found V.W. unresponsive.

¶ 14    Marvel testified that he was one of the first responders to defendant's residence. Defendant was in the kitchen when Marvel arrived. Marvel and defendant were alone in the kitchen when the two had a conversation. Defendant told Marvel that, when he woke up, his girlfriend was lying "down next to him and she had puke coming from her mouth, so he contacted the police department." Marvel then drove defendant to the McHenry County sheriff's office where he was interviewed on video by detectives. Upon entry into the interview room, defendant was advised by Detective Andrew Zinke that the room was equipped with video and audio equipment. Defendant told the detectives that he thought "someone gave her drugs or something." Defendant would go on to make this claim for the next 7½ hours, during which he reviewed the events of the previous night. He told the

detectives that "she didn't look fucking right when she came in." Defendant explained that he had known V.W. since the day before Easter and that he met her through an online dating service. Defendant told the police that V.W. had been out with someone and that "you need to research the records that someone gave her drugs or something." Again, defendant said that V.W. did not look right when she came in. He said he had never seen her like that before. Defendant said that he asked V.W. if she had taken anything and she said "no." Defendant said that V.W. told him that he was too good for her. Defendant then laughed and said, "you know what that means when a woman says that." Zinke then said, "that means they're cheating on ya . . ." to which defendant responded "Uh. I don't know if she did that. I know she was still talking online to guys and so forth but, you know."

¶ 15 Defendant told the police to look at the phone bill. Zinke assured defendant that that would be done. Zinke then asked defendant where V.W.'s cell phone was. In response, defendant said, "[o]h, hers? Fucking . . . she threw it on the ground. I picked it up and I fucking broke it in fucking half." Zinke then asked defendant where the phone's SIM card was and defendant said that it was sitting right in front of her purse on the coffee table. Defendant gave his verbal and written consent to search his home.

¶ 16 Defendant was asked to describe the events of the day before, starting in the morning. Defendant said he went to the gas station in the morning. V.W. was going to visit her son. V.W. was driving right behind him. He called her on her cell phone and asked her if she would like coffee. She said yes, and defendant went inside the station and got her coffee. He came out as she pulled into the station. Defendant noticed that one of V.W.'s tires was low. She drove to the shop where defendant worked and he filled the tire. Defendant asked V.W. to call him when she arrived in Wisconsin. According to defendant, he talked to V.W. around 12:30 p.m., and he called back around 2:30 p.m. but got V.W.'s voice mail. He said he just kept hitting redial over and over again and got her voice mail each time. Defendant then said "I knew there was a man of interest out there 'cause she moved out last weekend. She was on some dating line. I said fuck it, oh well, just like last week." Defendant explained that he was at work when a neighbor called and told him "you're old lady is moving out." Defendant then said "I think this–the guy she wants to go see gave her something." Defendant said that he spoke to V.W.'s husband and told him that V.W. had left a couple of items at his house. Defendant said that V.W. came to his house at 10:30 p.m. and that she had called him before she arrived. Defendant said that he did not want V.W. at his house and that she was weird. He was upstairs in his house when she arrived. After he came downstairs and let her in she started slapping him. Defendant asked V.W. if "the guy" had slipped her anything. He explained that he was referring to a man named Scott whom V.W. had met online. Defendant said that Scott's number would be on V.W.'s phone records. Defendant said that the previous week he told V.W. to "get the fuck out." Defendant apologized to V.W.'s ex-husband "for having her move back over there, you know–for the episode last week." Defendant then asked if there was any information about V.W. Zinke told defendant that they did not have any information at that time. Defendant said he met V.W. online the day before Easter and she moved in with him a few weeks later. Defendant described their early relationship as "fucking beautiful." He said he had never seen V.W. act weird before. He said she had been an "angel" and did not smoke or drink.

¶ 17      Defendant said that V.W. was not distraught when she arrived but that "it was like, actually a rage." He said that after he let her in he told her "grab your couple of things and go." He said that then they started arguing and "the next thing you know, I'm slapping, fucking–it's just like I don't know how many times I threw my fucking arms or whatever, same shit–different fucking week." The video showed defendant display for the police how he hit V.W. with his hands open. Defendant explained that he and V.W. had engaged in a physical altercation once before. Defendant said that V.W.'s face was "puffy" when she arrived. Defendant asked V.W. if she had taken something. He said she denied taking anything and that this "just added–fueled the fire." Zinke then asked defendant how he and V.W. calmed things down after their "little altercation." Defendant responded by saying that they calmed down by "making love." Zinke then said, "[o]kay, but I mean, is it just like–obviously something was said" and defendant replied, "[n]o, it's fuck you, I love you, wh–I don't want the other guy, shit like that." The detective then said "so, it de-escalates and then you guys go back to the bedroom." Defendant responded "yeah." Defendant said he went to bed "by about midnight, 1:30 and I fell asleep and the dog jumped on the bed and she's not allowed on the bed." He said that the dog woke him up and he went into the kitchen to let the dog out. He said he usually kept cigarettes by the back door because V.W. hated smoke. He was out of cigarettes, though, so he jumped into V.W.'s car, drove to the gas station, grabbed a pack of cigarettes, and went back home. As he walked in the bedroom he saw that drool came out of V.W.'s mouth and her nose was plugged up with "chunks." Defendant said he grabbed V.W. and started shaking her and dragged her off the bed and called 911. Defendant then asked to use the restroom. A detective told defendant that he would try to get news about V.W. Defendant said "I hope so. I don't know, man–she was just fucking cold when I touched her."

¶ 18      Defendant was told that there were detectives at his house and that they could not find the SIM card for V.W.'s phone. Defendant said that the card was on the coffee table in front of V.W.'s purse. Defendant returned to the subject of someone slipping V.W. drugs because she would never do drugs. Defendant said he wanted to know what was going on and that he wanted to go to the hospital. He agreed to provide a set of fingerprints for elimination purposes and provide a DNA sample.

¶ 19      It was pointed out to defendant that his hand was swollen. Defendant said he injured his hand the night before when he punched a piece of wooden wall trim. The police then falsely informed defendant that, although V.W. was in serious condition, she was "alive and kicking." During breaks in the interview, the video recorder continued to run. During two of these breaks defendant called his father using his cell phone. During the second phone conversation defendant told his father the following:

          "God. Hey, they just told me she's okay. I. Fuck. I was doing CPR on her, waiting for the paramedics–she had fucking–she was chocking on fucking vomit–every time I blew–every time I fucking blew in her fucking mouth, there was fucking vomit–shit kept coming out–I was pumping–I don't know–she was out all night. I don't know.

          No–no. I don't know. Actually, I told her not to come back to the house and uh, I called her. I even called her ex-husband and he's like I don't want her over here. Then she tried opening the windows in the basement and shit and finally I went downstairs and

-6-

we got in a fucking heated argument and both of us were slapping each other and the dog jumped on the bed and woke me up and when [V.W.] is there the dog is not allowed on the bed because of the hair and I went and took her to go let her out and fucking, my cigarettes are usually sitting right there on the little–there is a little nitch [*sic*] by the door. There were no cigarettes and my pants were in the living room so I threw my pants on and I let the dog out and went and grabbed a pack of smokes and fucking came back, walked in the bedroom and there she was this slurry shit on the fucking pillow coming out of her mouth and I looked and there's chunks in her nose and looking at her there's nothing and fucking grabbed her and she's fucking cold. And I shook the fuck out of her and started fucking slapping her and fucking–breathing in her mouth–every time I breathed in her mouth, all this puke would come out and she doesn't drink but I swear to God she was on something last night. I don't know where she ate. I don't know what she had, nothing. When I was there, they kept going towards the room and the sheriff wouldn't let me in the door. I saw them going–you know doing CPR and they did the suction cup thing and they told me to go sit in the kitchen. The next thing you know, they took her away and I haven't heard nothing since until just now.

You at work. Fuck. I'm at the sheriff's office. They want to keep me here for, I don't–they said I have to wait. All they're doing is an investigation at the house. Well, I'm stuck in this room here. I know that she uh–she was still on that fucking dating thing and she went and met a guy tonight. She came back all delirious and shit. Honestly, I think the guy fucking drugged her or something 'cause I've never seen this girl and it's only been two months, I've never seen her, nothing like this whatsoever–nothing.

So, like I said, Dad, I had no fucking response, I was freaking the fuck out and every time I fucking breathing [*sic*] inside her fucking, puke would come out her fucking nose and mouth and oh, God–pumping on her fucking chest and–what town you in? Okay–all right–bye. God–fuck–fuck–God–holy fuck, thank you–God. Holy shit, thank you."

¶ 20    After defendant's second phone call to his father, Detective Jacob Keltner told defendant that he wanted to talk about the physical altercation but first wanted to read defendant his *Miranda* rights. After being read his rights, defendant signed a waiver. Keltner asked defendant to be as specific as possible as to what took place after V.W. got home. Defendant said that V.W. "parked like hiding the car on the street." He said V.W. then tried to get into the house. He yelled out the window at her and she yelled back at him to let her in. Defendant said he came downstairs, unlocked the storm door, and let her in. Defendant repeated a version similar to that he had provided earlier in the recorded interview. He said that V.W. brought up "this other guy." He said he told V.W. on the phone before she arrived not to come back to his house, because she had moved out the previous week. When she arrived at his house defendant kept telling her to leave, but she was not acting like herself. V.W. nudged him and then started "swatting" him and he "swatted" her back. He said that "right upstairs" he punched a piece of oak on the wall a few times. Defendant said he then went out on the porch to have a cigarette and he asked V.W. to "fucking leave." Defendant then said, "the argument went on and on and the next thing you know, we're in the bedroom, having sex." Defendant denied using his fist on V.W. and said that he had only slapped her. He said V.W. tried to strike him but he blocked it. Defendant was asked where he hit V.W. and he

said that he hit her on her hands. According to defendant, the physical altercation lasted 30 to 45 minutes. V.W. was ranting and raving about the guy she had been with, and V.W. told him that she might "screw the other guy next week." Defendant denied using any weapons and again said that the injury to his hand was from pounding "the fucking wall hard." The police photographed defendant's hand as well as marks on his arms and a scratch on his left shoulder.

¶ 21    Defendant said that before he found out about V.W.'s new man they had planned to move to Lake Geneva and that he had signed a lease. He said that after V.W. visited her son she was supposed to come home. After he was unable to reach her he called her ex-husband, who told him that she had left the ex-husband's house. Defendant spoke to V.W. while she was on her way home and she was "being all fucking cocky and shit and telling me how this guy was great–she's going to go back an [*sic*] see him and sleep with him next weekend and I'm like you know–whatever." Defendant assumed that V.W. had been with Scott. Defendant said that he was "upset" with V.W. and had been upset since last week. Defendant was then asked, "[u]pset, pissed 'cause you're breaking up?" and he responded, "[y]eah, and she knew it, too. She's trying to get back together with me and she's like, you're not the same–that's because she fucking crushed me."

¶ 22    Defendant told the police that the physical altercation started after he closed the door and proceeded up the stairs. He was asked, "[h]ow does that de-escalate to where you guys are having sex in the bed?" and he said, "[m]akeup sex, I don't know." The detective told defendant that his story where V.W. comes downstairs, she is very happy about this new guy and is being cocky to defendant, but then she decides to have sex with him was a "far stretch." In response, defendant said, "[w]ell, it happened last week too, you know." Defendant said that the previous week's argument did not include "all the slapping and shit" and that, after discussing V.W.'s new guy, she lay in bed with defendant and told him that she could not be without him. Defendant was asked if V.W. had told him the previous night that she could not be without him, and he said that he did not think so. He said, "[i]t all happened so fast, you know, and then at one point we're fucking hugging and we're fighting and we're hugging and I don't know, it was a bunch of fucking chaos–it really was."

¶ 23    Defendant said that before ending up in the bedroom with V.W. he went outside on the deck to smoke a cigarette and drink a beer. He said that V.W. came outside and that things had calmed down. He said that they went back into the kitchen and things did not get heated again. Defendant was asked if he then went to the bedroom, and he said that he got undressed in the living room instead. He told V.W. that he had to go to bed because he had to get up to go to work. They then made their way to the bedroom where they had "a little kissing and hugging and sex." He said that the sex was not forced, it was consensual.

¶ 24    Defendant was asked about computers. He said that V.W. owned one and that it should be in the living room by the printer. Defendant was asked about his feelings toward V.W. and he said "I'm very aggravated with her but she has no place to go and I feel sorry for her." Defendant said that the previous night's argument began on the phone before V.W. arrived, when she told him that she was "going back and probably going to sleep with the guy next week and I'm like you go back there–stay there tonight." After V.W. arrived, defendant said, he called her a "fucking shit and a whore and shit like that and that's when the swinging

-8-

started."[1] Defendant said she swung first and then he shoved her and that is when he punched the wall. Defendant said he was slapping V.W., that he was "a little bit" fired up, and that "there is no way in hell I'm not going to deal with this kind of crap, you know and my love has been diminishing since last week." Defendant repeated that after the altercation he went out on the porch. He then said that everything was not fine after they came back inside. He said, "[o]h, in the bedroom, there was some pushing and shoving, in the bedroom." He said that he grabbed V.W. in the living room and held her. Keltner asked him if V.W. ever fell down, and defendant said he shoved her down and she hit the ground. He said that she hit her back "really hard." Keltner then asked what V.W. hit her back on and defendant said "[t]his was in the bedroom when I shoved her up against the wall, she landed like boom–like this." When asked if V.W. had any bruises on her, defendant said "[n]ot that I–I think on her leg or something like that." He said the bruise was from the altercation the night before.

¶ 25 Defendant said that, in the past, sex with V.W. would at times get rough but that the night before "[i]t was calmer. Last night, it was calm. We already had the roughness." Defendant was asked if he had choked V.W. or if she had any bruises on her neck or shoulders. He said "[s]he might–I grabbed her a couple of times." Defendant said that when they went to bed V.W. complained that her head hurt, but defendant said that V.W. got headaches all the time. He said that he "probably hit her way more than I ever should have."

¶ 26 Keltner explained that the police had a lot of interviews to do. Defendant said, "[w]ell, it's just me and her, right?" Keltner explained that when someone is transported to the hospital, the police have to interview the neighbors and "do a little bit of canvass." Defendant then said, "[i]t was a fight and yeah, I hit harder than her." Defendant said that when he gets moody he throws things and that cell phones were his favorite thing to throw.

¶ 27 After a break in the interview, Keltner told defendant he had talked to "some of the guys that are out at the house." He asked defendant if he had a bonfire the previous night, and defendant said, "[n]ot a bonfire." He said that he had a fire to burn "cardboard boxes and stuff" because he does not have garbage service. He said he had the fire at 8 p.m., "around dusk." Keltner then asked if there was anything else besides "cardboard boxes and stuff" in the fire. Defendant then admitted that he burned V.W.'s laptop, but he said that it was broken. He said that he broke the laptop the previous week, when he "slammed" it after V.W. told him she was talking online. After further questioning, defendant admitted that he burned other items belonging to V.W., including "[m]aybe a pair of pants and fucking shirt and box–just a couple of items–a banana box that she had her stuff [in]." Defendant said that he told V.W. that he had burned her things when they were in the kitchen, after she asked him for her box. Defendant said she "freaked out" when he told her about burning her things.

¶ 28 Defendant later was asked again about V.W.'s injuries. He said that at one point while he was swinging her around by her coat that she hit the wall. When asked about the bruise on her thigh, defendant said that he fell on her and he "kneed" her when he fell on her. Defendant again mentioned that V.W. had complained that her head hurt but that she did not

---

[1]The record reflects that V.W. was 5 feet 1 inch tall and weighed 126 pounds. Defendant is 6 feet 1 inch tall and weighs 210 pounds.

take anything for the pain. Defendant said that he knew things were getting out of control. He said, "[i]t wasn't good–it was fucking horrible." He admitted that he took some anger out on V.W.

¶ 29    During another break in the interview defendant poked his head out of the interview room and asked if Detective Robb Tadelman was available. Tadelman entered the interview room and defendant asked him if V.W. was alive. The detective responded, "[a]s far as I'm concerned, yeah." Defendant said, "Robb, tell me. I'm serious. 'Cause this is an awful long investigation." He explained that V.W. did not look good that morning and asked, "[t]hey revived her, right?" After another break in the interview defendant was told that V.W. was deceased. Defendant insisted that he did not plan to kill V.W. and that "he didn't want to hurt her." Defendant said again that V.W. complained about her head hurting only after lying down, that she was fine, and that he "didn't know that she was that hurt." Defendant was shown photographs of V.W.'s injuries. He said, "[o]fficers, I did not mean to do this at all." Keltner then asked defendant, "[a]t what point did you go too far?" Defendant responded that he went too far when he went into the bedroom and swung V.W. around by the hoodie and she hit her head against the wall. Defendant said that this was when he fell on her and "[w]e rolled around on the ground." Defendant was asked if V.W. blacked out at any point and he said, "[n]o, I was holding her."

¶ 30    Defendant was asked when he realized that V.W. was hurt, and he said he knew she was hurt when they were lying in bed. He said that her face was puffy and that she said that her face hurt from his slaps. Defendant said that V.W.'s face had already started to swell before they had sex. He said, "[i]t was already started, 'cause that was in the hall." Defendant said that he did not remember kneeing V.W. in the back and that he would not have kicked her, but that he knew he had fallen on her legs.

¶ 31    The detectives began reviewing his account again, starting with V.W.'s being let into his home. A detective asked, "[s]o you let her in?" and defendant responded, "[a]nd I did hang a calendar up above over one thing." Defendant explained that the "thing" was a hole he punched in the wall with his hand during the physical altercation with V.W. He said he covered the hole during the "back and forth" when they were "in each other's faces." Defendant was asked again if the sex was consensual, and he said yes. The following exchange then took place:

"Q. Did she have any complaints of injury during?

A. No.

Q. Was she starting to bruise up during?

A. Yeah.

Q. And then after the sex you realize she complains her head hurts and her face starts swelling up pretty bad?

A. Yeah, I–the first time I noticed that I didn't even look back at her.

Q. 'Cause you were ashamed of what happened?

A. Yeah, we actually made love doggy style.

Q. Because you didn't want to see her face?

A. Yeah.

Q. Because of the injury done?

A. No, I knew it was from me slapping her."

¶ 32    Defendant was asked about the bruise on V.W.'s back and he said, "I don't know if it was when we were rolling around or what." When asked what happened to her face, defendant responded "[w]hat did I fucking do–" but then said again that he only "slapped her a few times." He said that he did not bite V.W. and that he did not think that he gouged her. He said that they had sex on the bed. He was asked whether he tried to "clean any of it off" and he said "[n]othing. I just, the hole I put in the wall." Defendant explained that the hole in the wall from his fist was in the living room. Defendant reviewed some photographs of the home and shortly thereafter the interview ended with defendant's arrest.

¶ 33    Heather May, a forensic scientist with the Illinois State Police Crime Laboratory's DNA section, testified that defendant could not be excluded as the source of DNA material recovered from fingernail clippings from V.W.'s right hand. On the vaginal swabs taken at V.W.'s autopsy, a female DNA profile matched V.W. A male DNA profile matched defendant. Another male DNA profile did not match defendant.

¶ 34    Dr. Joseph Witeck, a forensic pathologist who performed the autopsy on V.W., testified that he had performed between 5,000 and 6,000 autopsies and had testified as an expert between 600 and 700 times. Dr. Witeck testified that V.W. had the following injuries: bruising on the left shoulder; bruising on the left and front of her chest; bruising on the right arm; bruising on the groin area; abrasions on the left shin; abrasions on the left elbow; and bruising on the back of the left arm and left hand. V.W. also had multiple areas of bruising on the back of her right arm and right hand. Dr. Witeck said that all of the bruises were fresh and very recent, and all of the injuries were due to blunt force.

¶ 35    Dr. Witeck identified the following areas of injury to V.W.'s head: a swollen face with bruising around the eyes and cheeks; ecchymosis (the passage of blood from ruptured blood vessels into subcutaneous tissue) around the eyes; fracturing of the skull just above the orbital bones; and bruising on the cheeks. Dr. Witeck then described the hemorrhage inside the scalp and said that there were multiple small areas of hemorrhage on the left side, left front, and forehead. According to Dr. Witeck, the bleeding was the result of two or more injuries that all merged together. He said that the injuries "literally wrapped around the head." Dr. Witeck said that repeated slamming of V.W.'s head into a wall could account for the injuries to her head. With regard to the injuries to her lower back, Dr. Witeck said they could have been caused by a kick. The doctor said that V.W.'s neck was also swollen with hemorrhages in the soft tissue. He said that this type of injury could have been caused by a punch or a choke hold, typically with a forearm. V.W. suffered subdural and subarachnoid hemorrhages caused by blunt force to her head. V.W. also had contusions to the subcutaneous fat of the chest wall and abdomen that showed bleeding. These injuries were consistent with being punched. Dr. Witeck also said that the blunt force injuries could have been caused by many different things.

¶ 36    Dr. Witeck explained that the orbital plate can fracture from the brain slamming against it with enough force. When it is broken, as in this case, "you get the leaking of blood around

the eyes." The doctor testified that "it would be very difficult to fracture [the orbital plate] just by punching somebody in the face." He said that the injuries to V.W.'s eyes, which were swollen completely shut, could have been caused by a fist. Dr. Witeck identified a series of photographs of V.W.'s injuries taken during the autopsy. The bruising to the inside and back of V.W.'s arms could have been caused by her holding up her hand "to ward off a blow from something."

¶ 37    Dr. Witeck was asked to explain how the injuries to V.W.'s brain would affect an individual. He testified that "initially they may or may not lose consciousness, but then as the brain continues to swell, it's going to be shutting down and that includes the vital functions such as breathing and the heart. It's not usually with this type of injury, it's not like shutting off a light switch. It's going to take a period of time. Sometimes minutes, sometimes hours." Dr. Witeck testified that, while there was no way "based on autopsy alone" to say how long V.W. survived, he did not think that it was very long. He testified that he believed that it was "a matter of minutes after the last injuries to her head occurred." Dr. Witeck explained that the fracturing of the orbital plates along the eyes caused V.W. to inhale blood. The orbital plates "connect into your nasal passages, your breathing area. So she actually inhaled some blood. She didn't have a lot of blood. So I don't believe she lived for a long time after those last injuries or that set of injuries." Dr. Witeck said that in examining V.W.'s lungs he saw "leopard spots," a term that describes what occurs when "you inhale blood on your own as she did because the injuries inside her nasal passages from the fractures, that blood is actually sucked into the lungs and makes it look literally like leopard spots."

¶ 38    On cross-examination, Dr. Witeck further explained that V.W. did not inhale a lot of blood, because, if she had, he would not have seen the leopard spots in her lungs. He said that, while he could not say within a reasonable degree of medical certainty whether she lived for minutes or hours, he did not believe that it was longer, for the reasons he stated. He further explained on cross-examination that if V.W. had inhaled a lot of blood over a period of time, one would not see spots, because the "spots all merge together as the lung fills up with blood and you just have a lung full of blood."

¶ 39    The State introduced a series of photographs of defendant's home, which included a damaged area of wall in the bedroom where V.W. was found, V.W.'s vehicle parked in defendant's driveway, and the fire pit in the backyard where V.W.'s laptop and the other belongings were burned.

¶ 40    The trial court denied defendant's motion for a directed verdict. As to the aggravated criminal sexual assault count, the trial court stated, "it would be a reasonable inference based upon the medical testimony that the defendant [*sic*] could not consent to the act should the jury wish to draw that inference."

¶ 41    The defense began its case by playing the 911 tape for the jury. Defendant explained that his girlfriend was not breathing, and he was given CPR instructions by the 911 operator. Dr. Jerrold Leikin, a toxicologist, testified that based on results from a Breathalyzer test administered to defendant at 9:47 a.m. on the morning of June 9, 2009, as well as on other information provided in the reports he reviewed, defendant's alcohol level was "likely between .137 and .337 grams per deciliter" on the evening of June 8, 2009.

¶ 42    Defendant introduced an unsigned lease agreement between him and a person named Paul Grasso for an apartment in Wisconsin.

¶ 43    Dr. Norman Kohn testified that he was a psychiatrist and a neurologist. Following an offer of proof, Dr. Kohn's testimony was limited to the field of neurology. Dr. Kohn stated that he had testified as an expert 5 to 10 times, but in only 3 or 4 criminal cases. On cross-examination he testified that he had performed "just a couple" of autopsies.

¶ 44    Dr. Kohn testified that he agreed with the autopsy report that the cause of V.W.'s death was "bleeding inside the head from subarachnoid and subdural hemorrhage." He testified that how long it takes a person who suffers a head injury to become unconscious or go into a coma "depends entirely on how fast the bleeding is, which varies from individual to individual." Dr. Kohn testified that it is possible for a person to suffer hemorrhages like V.W. suffered and "appear to be fine for hours afterwards." He also testified that a person can suffer these types of injuries and have "no outward sign or symptoms of the body." Dr. Kohn also said that "[t]here's nothing external on the autopsy or in the description that could have told me or anybody that she was suffering from these." He stated that from his review of the autopsy report he could not tell when V.W. would have lost consciousness.

¶ 45    On cross-examination, Dr. Kohn agreed that V.W. suffered multiple blows to the head that "could have been caused by slamming her head into a wall." Over a defense objection, the State asked Dr. Kohn the results of the toxicology report that was part of the autopsy report that he relied upon in forming his opinions. Dr. Kohn acknowledged that the report showed only that V.W. was "positive for caffeine."

¶ 46    The defense rested and the State presented no rebuttal. During the conference on instructions there was discussion by one of the assistant State's Attorneys regarding Illinois Pattern Jury Instructions, Criminal, No. 11.63 (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 11.63 (Supp. 2009)) ("Defense of Consent"). An off-the-record discussion then took place. The "defense of consent" instruction was given. However, the "definition of consent" instruction was not given.

¶ 47    The State argued that the evidence showed that V.W. was beaten "mercilessly" by defendant, who then sexually assaulted her. The State's position was that defendant's video-recorded version of a "consensual sexual encounter" was not worthy of belief. The defense argued that "everything [defendant] said in the video was accurate and true" and that the State "didn't put one person up here indicating that that sex was nonconsensual, that he punched her about the head or slammed her into any wall." The jury returned verdicts of guilty of involuntary manslaughter (720 ILCS 5/9-3(a) (West 2008)) and guilty of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2008)), and defendant was sentenced to consecutive imprisonment terms of 5 years and 18 years, with the sentence of 18 years for aggravated criminal sexual assault to be served at 85%. Defendant appeals.

¶ 48                                    II. ANALYSIS

¶ 49    Defendant's sole argument on appeal is that the evidence was insufficient to support his conviction of aggravated criminal sexual assault. Specifically, he contends that the State failed to prove: (1) V.W. was unable to give knowing consent; and (2) defendant knew that

V.W. was unable to give knowing consent. We disagree.

¶ 50    A criminal conviction will not be overturned unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). It is not the function of reviewing courts to retry the defendant when presented with a challenge to the sufficiency of the evidence. *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)). The relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) (Internal quotation marks omitted.) *Collins*, 106 Ill. 2d at 261. Under this standard we must allow all reasonable inferences from the record in favor of the prosecution. *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

¶ 51    In his brief, defendant notes the novelty of the State's theory. Rather than charging defendant with aggravated criminal sexual assault based upon "the use of force or threat of force" (720 ILCS 5/12-13(a)(1) (West 2008)) and infliction of "bodily harm" (720 ILCS 5/12-14(a)(2) (West 2008)) during the sexual assault, the State charged defendant under section 12-13(a)(2) of the Code. That section of the Code provides that a person has committed the offense of criminal sexual assault when he or she: (1) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act; or (2) was unable to give knowing consent. 720 ILCS 5/12-13(a)(2) (West 2008).

¶ 52    Cases involving section 12-13(a)(2) of the Code have involved allegations that the victims were mentally disabled, asleep, unconscious, drugged, or intoxicated. See *People v. Beasley*, 314 Ill. App. 3d 840 (2000) (victim was asleep); *People v. Fisher*, 281 Ill. App. 3d 395 (1996) (intoxicated victim who lost consciousness); *People v. Whitten*, 269 Ill. App. 3d 1037 (1995) (mentally disabled victim). Defendant correctly points out that no published Illinois decision "has dealt with the circumstances presented by this case." While defendant might be puzzled by the State's charging decision, we see nothing in the phrase "unable to give knowing consent" that prevents the State from proceeding on the theory that the beating defendant inflicted on V.W., to which he admits, rendered V.W. unable to give knowing consent and that defendant knew that V.W. was unable to give knowing consent. Indeed, defendant presents no challenge to the sufficiency of the indictment. Section 12-13(a)(2) of the Code "places no limitation on the reason for the victim's inability to *** give knowing consent." *People v. Lloyd*, 2011 IL App (4th) 100094, ¶ 30. Nor is it our job to create such limitations. *Id.*

¶ 53    In *Whitten*, 269 Ill. App. 3d 1037, the Fifth District observed in *dicta* that in cases involving section 12-13(a)(2) of the Code:

> "The courts have concentrated on the ability of a complainant to understand the consequences of a sexual act. Little if any attention has been given, under section 12-13(a)(2) of the Criminal Code of 1961, to situations where the victim, who might be a normal person, was unable to give knowing consent because of the predicament in which the victim found herself. (720 ILCS 5/12-13(a)(2) (West 1992).) Moreover, the courts have devoted little attention to the state of mind or intent of the perpetrator in relation to the victim's inability to give knowing consent. Perhaps it is time for courts to broaden

the inquiry." *Id.* at 1042.

¶ 54　　　As the court in *Whitten* stated, in section 12-13(a)(2) of the Code the legislature clearly indicated that there are two different ways to commit the crime. The first is "to knowingly have sexual relations with someone who is unable to understand the nature of the act, while the second method is to knowingly have sexual relations with someone *who, for any reason, is unable to give knowing consent*." (Emphasis added.) *Id.* The *Whitten* court further observed that courts "should not automatically intertwine these two ways to violate the statute, so that we are left with only one type of victim, the severely developmentally disabled person." *Id.* In reviewing a sufficiency-of-the-evidence claim, we "consider all the evidence before the jury, including the accused's perspective as to what he knew and when he knew it, in assessing the question of complainant's consent." *Id.* at 1042-43. In evaluating the evidence, we are not permitted to substitute our judgment for that of the jury on questions involving the weight of the evidence, the credibility of witnesses, or the resolution of conflicting evidence. *People v. Hruza*, 312 Ill. App. 3d 319, 325 (2000).

¶ 55　　Defendant opens his argument with an understatement: "[t]his is not a typical 'he said-she said' sexual assault case." V.W. cannot speak because she died as a result of the beating defendant inflicted upon her immediately before he engaged in an act of sexual intercourse with her. Defendant maintains that, since he is the only live witness and since he says that the act was consensual, any contrary view is not reasonable. He also maintains that the State failed to prove that V.W. was unable to give knowing consent, because neither the State expert, Dr. Witeck, nor the defense expert, Dr. Kohn, could determine when V.W. lost consciousness and because "the only evidence of V.W.'s consciousness at the time of the sex act came from [defendant's] statement to the police."

¶ 56　　Defendant characterizes Dr. Witeck's testimony concerning the time interval between the last head injury and V.W.'s death as "speculation." We do not agree with defendant's characterization. Dr. Witeck supported his opinion that he thought V.W. died within "a matter of minutes after the last head injuries occurred." Dr. Witeck explained that the fracturing of the orbital plates along V.W.'s eyes caused bleeding into her nasal passages. This caused V.W. to inhale blood. The fact that there were only "leopard spots" on V.W.'s lungs meant that she did not inhale a lot of blood. Therefore, Dr. Witeck opined, V.W. died within a matter of minutes, or hours, from the last head injury. On cross-examination, Dr.Witeck conceded that he could not give a specific time but he also said, "I don't believe it was longer for the reasons stated earlier." Dr. Kohn's testimony did not rebut Dr. Witeck's opinion on this point. Dr. Witeck was a forensic pathologist with significant experience in medicolegal death investigations. His opinion that V.W. died shortly after the last head injury was based upon unrebutted testimony about the condition of V.W.'s lungs, not the broader window of time during which death could occur to some hypothetical person who sustains head injuries similar to those inflicted upon V.W. Dr. Kohn's testimony that a person might appear to be "normal" minutes to hours before becoming unconscious was limited to persons who sustain "hemorrhages [such as those V.W.] died of and appear to be fine for hours afterward." Of course, this characterization does not apply to V.W. because, according to defendant's own admission, V.W. did not appear to be fine. She had obvious signs of head trauma around her eyes, which were so swollen that defendant did not want to look at V.W.

during the act of intercourse.

¶ 57　　Defendant did not object to Dr. Witeck's testimony at trial. Dr. Witeck clearly possessed the specialized training and knowledge to render his opinion and the jury was entitled to credit it. In order to be admissible, an expert's opinion as to time of death need not be precise. For example, in *People v. Hendricks*, 145 Ill. App. 3d 71 (1986), *rev'd on other grounds*, 137 Ill. 2d 31 (1990), the experts who testified estimated the victims' time of death based upon the contents of the child-victims' stomachs. The experts did not provide a precise time of death, but "posited a range *** during which death occurred." *Id.* at 99. While our supreme court reversed the defendant's conviction on other grounds, it rejected his argument that the trial court should have directed a verdict in his favor. The court commented on the State's forensic experts, who concluded that "the children had been killed sometime between 8:30 p.m. and 11:30 p.m." *People v. Hendricks*, 137 Ill. 2d 31, 64 (1990). The defendant's own experts disagreed with the State's experts concerning time of death. The State's evidence indicated that the victims, the defendant's wife and children, were dead before he left on a business trip. The court said that it was the jury's responsibility, and not the court's, to " 'resolve factual disputes, assess the credibility of the witnesses, and determine the weight and sufficiency of the evidence.' " *Id.* at 65 (quoting *People v. Yates*, 98 Ill. 2d 502, 518 (1983)). As we have stated, there was no direct rebuttal offered to Dr. Witeck's testimony regarding the condition of V.W.'s lungs at autopsy. While Dr. Kohn's testimony appeared to contradict Dr. Witeck's testimony, it was the jury's duty, not ours, to weigh the evidence. Argument that Dr. Witeck's opinion was speculation is not evidence. We agree with the trial court's reasoning that it was a reasonable inference, based upon the medical testimony, that V.W. could not knowingly consent. Indeed, even without Dr. Witeck's opinion regarding the time interval, the jury might have concluded that V.W. fought off defendant for as long as she could and was not penetrated until defendant finally rendered her unconscious. Or the jury might have concluded that V.W. was conscious when the act took place but she was unable to give knowing consent because of her mental or physical condition caused by the beating.

¶ 58　　We note that, at defendant's request, the jury was instructed, "[i]t is a defense to the charge of aggravated criminal sexual assault that [V.W.] consented." See IPI Criminal 4th No. 11.63 (Supp. 2009). This instruction is to be given when the defense of consent is raised and force is an element of the offense. See IPI Criminal 4th No. 11.63, Committee Notes (Supp. 2009); 725 ILCS 5/12-17(a) (West 2008). Defendant's statement certainly raised the issue of consent. However, the elements that the State was required to prove were: (1) defendant knowingly committed an act of sexual penetration upon V.W.; (2) when he did so he knew that V.W. was unable to give knowing consent to the act; and (3) he caused bodily harm to V.W. Defendant does not deny that the evidence clearly established that he knowingly committed an act of sexual penetration upon V.W. and that he caused bodily harm to V.W. Defendant's challenge to the evidence lies in the State's proof regarding V.W.'s inability to give knowing consent and proof that defendant knew that V.W. was unable to give knowing consent. "Knowledge generally refers to an awareness of the existence of facts which make an individual's conduct unlawful ***." *People v. Weiss*, 263 Ill. App. 3d 725, 731 (1994) (citing *People v. Gean*, 143 Ill. 2d 281, 288 (1991)). The statutory definition

provides:

> "§ 4-5. Knowledge. A person knows, or acts knowingly or with knowledge of:
>
> (a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists." 720 ILCS 5/4-5 (West 2008).

¶ 59    Knowledge by its very nature is ordinarily established by circumstantial evidence rather than by direct evidence. *Weiss*, 263 Ill. App. 3d at 731. "The State must present sufficient evidence from which an inference of knowledge can be made, and any inference must be based upon established facts and not pyramided on intervening inferences." (Internal quotation marks omitted.) *People v. Nash*, 282 Ill. App. 3d 982, 985 (1996).

¶ 60    Defendant argues that the State has conflated the "concepts of consent, use of force, and capacity to consent, and essentially asserts that due to defendant's use of force in beating [V.W.], [V.W.] was unable to give knowing consent, or that her consent was not freely given because it was given only to prevent any further use of force." Defendant states that "such arguments are essentially 'use of force or threat of force' arguments, not 'unable to consent' arguments." While we agree with defendant that such arguments are usually made in "use of force or threat of force" cases, that does not preclude the State from arguing a violation of section 12-13(a)(2) of the Code in that a victim in V.W.'s condition cannot provide knowing consent. 720 ILCS 5/12-13(a)(2) (West 2008). We agree with the reasoning of the court in *Whitten* that "[k]nowing consent requires us to examine all of the circumstances to see if defendant knowingly exercised such control over complainant that a trier of fact could find that complainant did not submit to the sexual advances of defendant voluntarily, intelligently, and by an active concurrence." *Whitten*, 269 Ill. App. 3d at 1044.

¶ 61    In assessing the question of V.W.'s consent, we consider "the accused's perspective as to what he knew and when he knew it." *Id.* at 1042. As the court in *Whitten* stated, " '[c]onsent' implies a willingness, voluntariness, free will, reasoned or intelligent choice, physical or moral power of acting, or an active act of concurrence (as opposed to a passive assent) unclouded by fraud, duress, or mistake." *Id.* at 1044 (citing Black's Law Dictionary 377 (4th ed. 1968)). Illinois's prior rape statute, which was derived from the common law, was replaced with a statute defining new offenses called criminal sexual assault. "[T]he new statute makes the issue of consent an explicit defense where the evidence must show a freely given agreement to the act of sexual penetration or conduct. Lack of verbal or physical resistance does not constitute consent." *People v. Beasley*, 314 Ill. App. 3d 840, 845 (2000) (citing Aaron Jaffe & Reynold E. Becker, *Four New Basic Sex Offenses: A Fundamental Shift in Emphasis*, 72 Ill. B.J. 400, 403 (1984)); see also 720 ILCS 5/12-17(a) (West 2008) (definition of consent where force or threat of force is an element of the offense). Even under our prior rape statute, it was clear that a victim need not resist if her efforts would be futile and would endanger her life. *People v. Smith*, 32 Ill. 2d 88, 92 (1965). This is equally true where a victim is overcome by superior strength or fear. "Consequently, reasonable acquiescence to threats of violence does not constitute consent." *People v. Schmitt*, 99 Ill. App. 3d 184, 188 (1981) (citing *People v. Burgin*, 74 Ill. App. 3d 58, 64 (1979)). Here,

defendant admitted to beating V.W. during an altercation that lasted 30 to 45 minutes before they had sex. He even admitted to the police that they had sex "doggy style" because he could not look at the physical injuries that he had caused to V.W.'s face immediately before having sex with her. Based upon the type of beating that defendant admitted to, as well as physical evidence of such a beating on V.W.'s face, the jury reasonably inferred that defendant knew that V.W. could not knowingly consent to have sex with him.

¶ 62    In *People v. Roberts*, 182 Ill. App. 3d 313, 317 (1989), the court stated that "[c]onsent is the very antithesis of force. Where the State proves defendant used force, it necessarily proves the victim did not consent." The court in *Roberts* relied upon language used by our supreme court in *People v. Haywood*, 118 Ill. 2d 263 (1987), where "the court found nonconsent to be the equivalent of use of force." *Roberts*, 182 Ill. App. 3d at 317. In *Haywood* the court stated:

"In common understanding, if it is said that one was forced to perform an act, it follows that the person's act was nonconsensual; and if one freely consents to the performance of an act upon oneself, clearly that person has not been forced. Thus, although the prosecution is not required to prove nonconsent formally, it is obvious that if the prosecution shows that there was an act of sexual penetration by force, that evidence demonstrates that the act was nonconsensual. To prove the element of force is implicitly to show nonconsent. Too, if force is established it would be redundant to require a separate showing of nonconsent as part of the prosecution's case in chief. Thus, consent is made a defense to be raised by the accused to rebut evidence of force presented by the State." *Haywood*, 118 Ill. 2d at 274.

¶ 63    As we have explained, the issue in this case is not whether defendant used or threatened the use of force against V.W. He freely admitted that he used force against V.W., causing extensive injuries that ultimately caused her death. Defendant complains that the State's arguments in this case are "essentially 'use of force or threat of force' arguments, not 'unable to consent' " arguments. We do not agree. In *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 37, while recognizing that the State's theory of "unable to give knowing consent" is often raised in other circumstances, it is not limited to situations where an otherwise competent person is temporarily incapable of giving consent because the victim "was unconscious, asleep, or severely intoxicated." (Internal quotation marks omitted.) In *Vaughn*, the acts committed upon the victim occurred while she was awake. Contrary to defendant's argument, "[t]he statute does not require proof that the victim's mental impairment alone rendered her incapable of giving or withholding consent. The State need only establish that due to circumstances beyond her control she was unable to give knowing consent." *Beasley*, 314 Ill. App. 3d at 846-47 (citing *State v. Willenbring*, 454 N.W.2d 268 (Minn. App. 1990)). Here, we find that, just as the incapacitating effects of drugs or alcohol can rob a victim of his or her ability to give knowing consent, so too could the effects of the physical beating that V.W. endured. After considering the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that V.W. could not give knowing consent as a result of the severe beating defendant inflicted upon her, whether she was conscious or unconscious at the time the act of sexual penetration occurred.

¶ 64    Defendant argues that, even if "jurors could have made some reasonable inference that

-18-

V.W. was incapacitated, the additional leap to conclude that defendant knew that is completely unsupported by any evidence, and is, in fact, rebutted by defendant's statements regarding the sex act." Defendant goes on to argue that, given that he and V.W. "had sex immediately following their previous fight, he would have no reason to question V.W.'s engaging in sex with him right after this argument." We reject both of these arguments.

¶ 65 First, there is no "implied consent" to sex with another adult, even when that other adult is a spouse. *People v. M.D.*, 231 Ill. App. 3d 176, 190 (1992). In *M.D.*, we said that the purpose of the statutory scheme "is to protect the personal dignity of potential victims of sex offenses." *Id.* at 188 (citing *People v. Terrell*, 132 Ill. 2d 178, 210 (1989)). We also recognize that "[s]exual assaults are generally violent, degrading acts which cause severe physical and emotional damage to the victims." *Id.* (citing *Coker v. Georgia*, 433 U.S. 584, 597-98 (1977)). In rejecting the implied consent theory, we said that it would deprive women of "their dignity by refusing to recognize them as whole human beings who are entitled to decide whether or when they will engage in sexual relations." *Id.* at 189. We therefore reject defendant's argument that, because he and V.W. had sex after a previous argument, defendant would have had no reason to question V.W.'s consent, and we do so in the strongest possible terms.

¶ 66 Second, contrary to the argument defendant makes throughout his briefs, his video-recorded statement was not unrebutted. We reject defendant's reliance on *People v. Ortiz*, 196 Ill. 2d 236 (2001), for the proposition that defendant's unrebutted recorded statement cannot be ignored. *Ortiz* involved a charge of controlled substance trafficking. Ortiz was the driver of the truck in which the police discovered a large quantity of a controlled substance in a hidden compartment. At trial, Ortiz testified and denied any knowledge of the drugs. Ortiz's testimony was supported by the testimony of the State's own witness, a state trooper. Our supreme court noted that "[t]he circumstantial evidence was scant at best, and appears even weaker in light of the evidence supporting a not guilty finding." *Id.* at 267. Not only did defendant not testify in this case, but there was *no* testimony, circumstantial or direct, other than his own self-serving statements, that supported his theory that V.W. consented. Common sense alone, which jurors use in evaluating evidence, belies defendant's story. Accepting defendant's version would turn on its head our society's rejection of the archaic notion that a man can use his superior size and strength as a means of sexual conquest.[2]

¶ 67 In examining defendant's claim that his version of events was unrebutted, we begin with the obvious. He was intoxicated during the entire event and even drank more alcohol at his house while the police were present. He gave inconsistent versions to the officers at the scene and added the trip to the gas station only after he was told that the police had spoken to his neighbor. He lied about V.W.'s belongings. He concealed a hole in the wall that he claimed was from a punch and he never explained moving V.W.'s car from the street to his driveway, where he was seen entering the car at 5:45 a.m.

---

[2]For an excellent discussion of the nation's sexual assault laws, see John F. Decker & Peter G. Baroni, *"No" Still Means "Yes": The Failure of the "Non-Consent" Reform Movements in American Rape and Sexual Assault Law*, 101 J. Crim. L. & Criminology 1081 (2011).

¶ 68    Defendant acknowledges in his reply brief that his cite to *Ortiz* in his opening brief should have been a "see" cite; however, he also argues that "[a]t least some of the State's evidence supported the defendant's statement." He refers to defendant's statement that V.W. "appeared fine and held a conversation with him." He says that this statement was supported by Dr. Witeck's testimony that a person with these types of injuries could be lucid for a period of time and appear to be perfectly fine. This assertion ignores the obvious. Defendant, not some other person, beat V.W. He told the police that V.W.'s face looked so bad from him striking her that he could not bear to look at her during the sex act. Defendant's argument on this point misses the mark completely.

¶ 69    After considering the evidence in the light most favorable to the prosecution, we find that the jury's verdict finding defendant guilty of aggravated criminal sexual assault is neither improbable, unconvincing, inconclusive, nor contrary to human experience. Defendant admitted that he was angry with V.W. and that, in taking out his anger on her, he fought with her for 30 to 45 minutes, inflicting injuries over V.W.'s entire body. Defendant, immediately after beating V.W., committed an act of sexual penetration on her while she was in the throes of death. Defendant gave police inconsistent versions of what occurred. He admitted covering a hole in the wall caused during the beating and to smashing V.W.'s cell phone. He lied to the police about V.W.'s computer and belongings, which he burned. He never explained how V.W.'s car got from the street to the driveway. Although defendant maintained that V.W. consented, he never described any conversation with V.W. regarding her consent to the act. Rather, he said that it just happened after the "argument" and that it was "makeup sex," which occurred immediately after slamming V.W. into the bedroom wall.

¶ 70    The determination of the credibility of defendant's statements and the weight to be accorded to those statements, together with the reasonable inferences to be drawn therefrom, are the responsibility of the trier of fact. *People v. Brown*, 185 Ill. 2d 229, 250-51 (1998). Thus, while defendant maintains that V.W. was "awake" during the sex act he performed on her, and that the act was consensual, it was up to the jury to decide whether V.W. was unable to give knowing consent and whether defendant knew that she was unable to give knowing consent. We find that there was more than sufficient evidence to support the jury's verdict.

¶ 71                                III. CONCLUSION

¶ 72    We affirm defendant's conviction of aggravated criminal sexual assault. We conclude that the evidence demonstrated that as a result of the beating defendant inflicted upon V.W. she was unable to give knowing consent; that defendant knew that V.W. was unable to give knowing consent; and that defendant caused bodily harm to V.W.

¶ 73    Accordingly, the judgment of the circuit court of McHenry County is affirmed.

¶ 74    Affirmed.