2019 IL App (3d) 170827

Opinion filed August 23, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Grundy County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0827 Circuit No. 13-CF-183 |
| KENTON PELLEGRINI, | ) ) | Honorable Robert C. Marsaglia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Lytton and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1     The State charged defendant, Kenton Pellegrini, by indictment with aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2012)), criminal sexual assault (*id.* § 11-1.20(a)(1)), and aggravated domestic battery (*id.* § 12-3.3(a)). The charges stem from allegations defendant forcefully inserted his fingers or hand into the vagina of the victim without her consent, thereby causing harm. A bench trial ensued with Judge Robert C. Marsaglia presiding.

¶ 2     The trial court found defendant guilty on all three counts. After exhausting posttrial motion practice, the defendant filed a direct appeal renewing arguments presented in his

posttrial motions. This court affirmed defendant's conviction. *People v. Pellegrini*, 2016 IL App (3d) 150802-U.

¶ 3　　Defendant then filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), which advanced to a third-stage evidentiary hearing. The petition alleged ineffective assistance of counsel for failure to present expert testimony. In dismissing the petition, Judge Marsaglia found that defendant was not prejudiced by the lack of expert testimony. Defendant appeals, arguing, *inter alia*, the dismissal was manifestly erroneous. We affirm.

¶ 4　　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　　　　　　　　　　　A. Bench Trial

¶ 6　　This is the second appeal in this matter and, as such, we borrow from the statement of facts in the direct appeal. See *Pellegrini*, 2016 IL App (3d) 150802-U, ¶¶ 4-45.

¶ 7　　The victim testified at trial that she and defendant married in July 2001. The couple discussed a divorce in late 2011 and by September 2013, the marriage was "rocky." The victim described the couple's sex life in 2013 as "[n]ot good. Very infrequent." Elaborating, the victim stated, "I had basically just lost interest. I lost my feelings of love for him. Just the way he treated me I thought was terrible and basically treated me like a tool, not even like a person, no compassion. Just a rough marriage." Defendant, however, had a high interest in sexual intercourse and would pressure the victim daily.

¶ 8　　On September 27, 2013, the victim and defendant attended a festival in Morris with their neighbors, Richard and Kelly Mote. The victim did not plan on having sexual relations with defendant that night. According to the victim, she had one beer around 8 p.m. before defendant drove the group to the festival. She believed she consumed approximately six

beers at the festival from 9 p.m. to 1 a.m. Defendant then drove the victim and the Motes back to the Pellegrinis' residence around 1 a.m. Around this time the victim began to feel dizzy, nauseous, and was experiencing the effects of the alcohol.

¶ 9 The victim recalled vomiting in the backyard and being in a bathroom inside the house. She did not remember leaving the bathroom. The next thing she could recall was being on her bed alone with the lights on, wearing her clothes. After that, the victim remembered defendant standing next to the bed, hovering over her, as he told her he wanted to have sexual intercourse. The victim replied, "just leave me alone." However, defendant removed the victim's pants and underwear. The victim told defendant, "No. Stop." She began kicking defendant and telling him to leave her alone. The victim pulled away and defendant pulled her back several times. Defendant pushed and held the victim down on the bed. The victim continued to kick and push defendant while he held her down. Defendant had his hands cupped in such a way that the victim could not tell if he had something in his hands. Defendant was "jabbing and pushing and poking his hands into [her]." The victim described defendant's action felt "like a stabbing or a punching, just a full force thrust with his hands, both sides of [her] vagina, [while] saying to [her], 'Here, take that. How does that feel? I'll do what I want to you tonight.' " The victim began screaming "Stop. Stop. What are you doing? Why won't you stop? Why won't you stop?" The victim testified that she did not consent to defendant's actions.

¶ 10 While defendant continued to force his hand into the victim's vagina, she became nauseous and blood began "gushing" from the region. The victim felt like she had a bowel movement and then began to vomit. Once the victim started bleeding, defendant left the bedroom, grabbed towels, and started cleaning up the blood. Defendant did not call for help.

While defendant was cleaning up the blood, the victim was screaming and crying. Defendant then left the room.

¶ 11    When defendant was gone, the victim's "flight or fight response kicked in." She grabbed a towel, wrapped it around her body, and ran out the front door of the house. She ran across the street to the Motes' residence, knocked on the front door, and began yelling for help. However, the Motes did not answer the door before defendant came, grabbed the victim, and carried her home. Defendant told her to "shut up, stop making a scene, come home, come home." The victim left blood on the Motes' front doorstep. Defendant brought the victim back to their front porch. The victim continued to fight off defendant, leaving blood and feces on their front porch. Defendant brought the victim inside the house, placed her on an ottoman in the entryway but did not call for emergency services. The victim continued to scream because she was in pain and bleeding.

¶ 12    Subsequently, police and paramedics arrived. According to the victim, while the first responders attended to her, she was hysterical and "kind of starting to black out a little bit[.]" The victim spent four days in the hospital.

¶ 13    The victim testified that she spoke to Detective Alicia Steffes when she was released from the hospital. She acknowledged telling Steffes that she did not recall how she returned to the house from the Motes' because she was getting to the point of "blacking out."

¶ 14    On cross-examination, the victim admitted she did not remember many of the events from that evening. For example, she acknowledged that she could not recall speaking to Officer Jessica Smith (who was one of the first responders) and telling Officer Smith that defendant was "too big" and "got stuck." The victim also acknowledged she was unable to recall some of the details of the festival or how she got to the backyard pool. However, she

- 4 -

specifically remembered the time frame during the attack. According to the victim, "[f]rom the time of the attack, the time I went to the hospital, I was 100 percent alert."

¶ 15    Richard Mote testified that he and his wife attended the festival with the Pellegrinis. On their way home from the festival, the victim mentioned going for a swim and went to the backyard to turn on the pool heater. When the victim did not return, defendant and Richard went outside to search for her. A video recording taken by Richard with his cellular phone showed the victim sitting beside the pool. The video also showed defendant assisting the victim into the home.

¶ 16    According to Richard, once inside, the victim went into the hallway bathroom. Sometime later, Richard helped defendant open the bathroom door that was locked from the inside. The men popped open the locked door and observed the victim was awake, sitting on the toilet with her elbows on her knees and hands on her forehead. Defendant then led the victim into the bedroom. Around 1:45 a.m., the Motes left the Pellegrinis' residence.

¶ 17    Richard fell asleep at his home and was later awoken by a loud scream. He went outside and heard a voice say, "get back in the house." About five minutes after he heard the screams, an ambulance arrived in the neighborhood.

¶ 18    Two neighbors that lived on the same street as the Pellegrinis also testified. Their sleep was also interrupted by a female screaming in the middle of the night. They both called the police.

¶ 19    Monty Allbert, a Morris police department sergeant, testified that he responded to a call at 3 a.m. regarding a report of a female screaming. When Allbert arrived at the Pellegrinis' residence, he made contact with defendant through the screen door and asked what was going on. Defendant told Allbert that his wife was "wasted." Allbert observed blood and feces on

the front step of the porch and heard moaning from inside the home. Defendant asked Allbert to call an ambulance but said Allbert could not come inside because his wife was naked.

¶ 20    Allbert asked defendant to step outside and questioned him about what happened. Defendant explained they had gone out that night and that the victim "got drunk, and they came home and bam, she started bleeding." Allbert entered the home and spoke to the victim. She told him, "[defendant] did this to me." When Allbert asked what defendant had done, the victim stated she did not know.

¶ 21    Officer Jessica Smith arrived and entered the house. Smith observed the victim bleeding profusely. The victim repeated that "[defendant] did this to me." According to Smith, defendant tried to enter the house and comfort the victim, but the victim told Smith to keep defendant away from her. Smith also overheard the victim tell the paramedics who had arrived, "he was too big and he got stuck."

¶ 22    Nurse Savannah Jones treated the victim at Morris Hospital. When the victim arrived at the hospital, she was conscious, alert, and talking. However, Jones stated that the victim's condition was serious and became critical due to the amount of bleeding. Jones asked the victim what had happened. The victim stated she and defendant had been drinking at a festival and then returned home. Defendant wanted to have sexual intercourse with the victim, but the victim did not. Defendant then tried to "jam" something into her vagina. The victim was not certain what defendant had tried to force into her.

¶ 23    Dr. Sean Atchinson treated the victim in the emergency room. Initially, Atchinson could not stop the victim's bleeding. He explained, "I essentially had a patient that I thought was potentially bleeding to death in front of me." On cross-examination, Atchinson stated that based on the blood alcohol test he ordered, the victim's blood alcohol content was .15 and

would be considered an "elevated level." On redirect, the prosecution clarified that the hospital conducts blood serum testing for alcohol content and not whole blood testing; as is done for compliance with the driving under the influence (DUI) standard of .08. In comparing the two, Atchinson noted the blood serum amount would have to be reduced anywhere from 12 to 22% to be used as a whole blood result for placement on the commonly recognized DUI scale. The prosecution averred that such a conversion would result in a whole blood alcohol content of .11 to .12; Atchinson agreed.

¶ 24    Dr. Leticia Setrini-Best (Best) performed surgery on the victim. Best observed tears on both sides of the victim's vagina approximately eight centimeters long and about two centimeters deep. According to the doctor, no normally occurring medical condition would explain the injuries observed. Best described the victim's injuries as life threatening and believed that a large fist could have caused the injuries. She had observed similar injuries in a difficult, instrumented vaginal delivery. However, she opined the victim's injury was not caused by a sex toy or "rough sex." Further, Best stated the victim's injuries were not the result of routine sexual acts. Instead, the victim's injuries were caused by a tremendous amount of force.

¶ 25    Best also testified she was aware of, and disagreed with the opinion from medical defense expert, Dr. Brian Locker, that due to the victim's perimenopausal state, she was more susceptible to vaginal injury. According to Best, based on her observations of the tissues in question, she believed the victim was healthy, well estrogenized, and showed no signs of atrophic vaginitis.

¶ 26    Allbert interviewed defendant at the Morris police station. Defendant initially told Allbert he had carried the victim to their bed when she began bleeding. Later in the interview,

however, defendant claimed he had used a sex toy and his fingers to initiate foreplay with the victim. A video recording of the interview was admitted into evidence and presented at trial.

¶ 27    Defendant testified at trial. According to defendant, when he entered the bedroom on the night of the incident, he observed the victim leaning back against the headboard of the bed. Defendant began rubbing her back and legs and fondling her vagina. The victim did not tell defendant to stop or state that she was feeling ill. Defendant and the victim kept a sex toy on either side of the bed in a drawer. Defendant began using the sex toy on the victim for approximately 30 seconds. He stopped when the victim pushed his hand away. He interpreted the victim's action as her wanting him to use his hand, rather than the sex toy. Defendant then lubricated his fingers with A+D ointment and "slowly" inserted his fingers into the victim's vagina. Defendant denied that he forcefully inserted his fingers into the victim and denied that she screamed, told him to stop, kicked, punched, or pushed him.

¶ 28    Defendant claimed that when the victim pushed back against him, she lunged forward, and he saw two "chunks" of blood come out of the victim's vagina and onto his hand. He grabbed a towel from the bathroom and used it to stop the bleeding. Defendant thought the bleeding had stopped and went back to the bathroom. When he returned to the bedroom, the victim was gone.

¶ 29    Defendant found the victim running toward the Motes' residence without a shirt or pants. He saw her holding onto the door handle of the Motes' home with one hand and banging on the door with the other hand. Defendant carried the victim over his shoulder and returned to their home. He noticed the victim was still bleeding.

¶ 30    Dr. Brian Locker testified for the defense. Locker reviewed the victim's treatment records at Morris Hospital and all the police reports. Locker had observed injuries like the victim's

on hundreds of occasions, usually in situations of natural child birth. Locker stated the victim's injuries could occur in a nonvaginal birth situation. He gave two specific examples of such situations: a woman falling into a manhole cover and a jet ski accident.

¶ 31 Locker asserted that in his opinion, the victim's injury was the result of the combination of defendant inserting his three fingers beyond the knuckles into the victim's vagina and her vagina being less elastic. He believed the victim was more susceptible to vaginal injury because she was premenopausal or perimenopausal and from dehydration caused by alcohol consumption.

¶ 32 Ultimately, the trial court found defendant guilty of all charges. Defendant filed a motion for judgment of acquittal or, in the alternative, a new trial. After hearing arguments, the trial court first rejected defendant's argument that the evidence was insufficient to prove his guilt. The trial court then rejected defendant's alternative argument that trial counsel was ineffective for failing to support Locker's trial testimony by way of medical records. In particular, the trial court found defendant was not prejudiced by counsel's performance. The trial court sentenced defendant to a term of eight years' imprisonment.

¶ 33                                    B. Direct Appeal

¶ 34 On direct appeal, defendant renewed his arguments that the evidence provided at trial was insufficient to prove him guilty beyond a reasonable doubt and he received ineffective assistance of counsel. *Pellegrini*, 2016 IL App (3d) 150802-U, ¶ 2. In affirming defendant's sentence, a panel of this court found that the evidence was sufficient to prove defendant had committed the offense convicted of and that defendant was not prejudiced by the lack of corroborating records. *Id.* ¶¶ 58, 63. In a footnote, the court noted that neither party had

addressed whether the victim's level of intoxication impacted the issue of consent. *Id.* ¶ 49 n. 2.

¶ 35                              C. Postconviction Proceedings

¶ 36        Thereafter, defendant filed a postconviction petition. Defendant, in his petition, alleged that the victim's whole blood alcohol level was much higher than the State had suggested at the time of the incident. He also argued that trial counsel was ineffective for failing to retain expert testimony regarding his wife's intoxication and her correlating ability to accurately and/or reliably testify about the incident.

¶ 37        The proceedings advanced to a third-stage evidentiary hearing. Judge Marsaglia, again, presided. At the hearing, Dr. Patrick Lank, a board-certified physician in medical toxicology, testified that based on his calculations, taking all relevant circumstances into account, the victim's whole blood alcohol range was equivalent to .193 to .230 between 2:40 and 3 a.m. on the morning of the incident—not .11 to .12 as previously thought.

¶ 38        Dr. Kim Fromme, a professor of clinical psychology, testified as an expert witness for defendant in the field of alcohol intoxication and its effects on various processes including memory. Fromme testified that alcohol impacts the transfer of short-term memory into long-term memory. She further explained that when an alcohol-induced blackout occurs, subjects will create a narrative in an attempt to fill gaps in their memory. She stated that a subject can fill gaps by referring to things that they have read about, experienced in the past, or been told about. She admitted that a third party cannot tell if someone else is suffering an alcohol-induced blackout because one cannot see into another's mind. However, in Fromme's opinion, the victim experienced alcohol-induced blackouts on the evening and early morning in question. This opinion was based on the victim not being able to remember which

- 10 -

bathroom she had locked herself in, why she was there, or how she got out of the bathroom. Fromme then pointed to specific examples of what she believed was the victim filling gaps in her memory by borrowing from statements of others. She further opined, "consistent with the science of alcohol-induced blackout, gaps in memory, efforts to construct a narrative based on past experience, what people have told you, how you think about yourself and others, and the evolution we saw of her description of the events of the night[,] *** [the victim's] recollections are unreliable."

¶ 39    Dr. David Hartman, a clinical and forensic neuropsychologist, testified for the State in rebuttal. He opined that Fromme's training was academic in nature and not in any area related to clinical diagnosis. Thus, since Fromme was not licensed as a clinical psychologist, she was unable to make a clinical or medical diagnosis. He claimed there were fatal errors in Fromme's logical reasoning and potential ethical violations due to her diagnosis of the victim without a license. Hartman disagreed that the victim had constructed her memory of the incident from other memories. He stated that Fromme's own published research contradicted the testimony she had given and that it was error for Fromme not to consider that the victim had gaps in her memory due to massive blood loss and the sexual assault. Essentially, Hartman's testimony was that "there was virtually nothing in [Dr. Fromme's report] that was correct from a scientific and clinical standpoint[.]"

¶ 40    The circuit court, in its written order, found that the defendant was not prejudiced by the lack of "blackout" testimony. The testimony of the experts was thoroughly summarized in the order. The court found that while defendant had shown the victim was more intoxicated than initially thought, it was clearly established during the bench trial that the victim was severely intoxicated. The court stated, "This Court, like all courts hears multiple cases and

- 11 -

much testimony by and from witnesses who have drank alcohol to excess or observed others who had drank alcohol to excess." The victim's testimony was found to be credible while defendant's was found to be incredible. The court went on to cite testimony that corroborated the victim's and stated, "[t]his Court has now heard the alcohol blackout testimony and finds that it would not have changed the verdict." It noted, "Dr. Fromme's testimony that this particular witness suffered an alcohol blackout is not consistent with the actions and statements of the victim *immediately* after the incident in question." (Emphasis in original.)

¶ 41    This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    Defendant argues on appeal that: (1) the decision to dismiss his postconviction petition after the third-stage evidentiary hearing was manifestly erroneous; (2) the circuit court applied the wrong standard in analyzing his ineffective assistance of counsel claim; and (3) he was denied due process of law when the trier of fact interjected personal knowledge into the final determination.

¶ 44                        A. Dismissal of Postconviction Petition

¶ 45    Defendant contends that the circuit court's dismissal after the third-stage evidentiary hearing was manifestly erroneous. The State argues defendant's claims are barred by *res judicata* and forfeiture. In the alternative, the State claims defendant was provided effective assistance of counsel.

¶ 46    Initially, the State alleges that it has forfeited its *res judicata* and forfeiture arguments because they are affirmative defenses that were not asserted below citing *People v. Blair*, 215 Ill. 2d 427, 440 (2005). The State then proceeds to claim that such forfeiture is only a bar on

the parties and not a limitation on the court, citing *In re Madison H.*, 215 Ill. 2d 364, 371 (2005). These assertions are fallacious.

¶ 47     In the arena of postconviction petitions, forfeiture and *res judicata* are not affirmative defenses at the trial court level. See *Blair*, 215 Ill. 2d at 440 ("[forfeiture] and *res judicata*, while generally deemed to be affirmative defenses like timeliness, can be characterized for purposes of the Act as being integral to the substantive merits of the petition."). Black's Law Dictionary defines "affirmative defense" as an "assertion raising new facts and arguments that, if true, will defeat the [defendant's] claim, even if all allegations in the [petition] are true." Black's Law Dictionary 430 (7th ed. 1999). *Blair* makes it evident that the aforementioned doctrines are substantive considerations the trial court must contemplate when determining whether a defendant's petition asserts the gravamen of a constitutional claim—not assertions that must be advanced by the State. *Blair*, 215 Ill. 2d at 445. While the doctrines can be asserted at the second stage as defenses, failure to do so does not constitute forfeiture, nor does it preclude the assertion of the doctrines for the first time on appeal. See *id.* at 450, 456 (noting the State had not indicated that it wished to forgo the defenses of *res judicata* and forfeiture on appeal). The State has not forfeited these arguments.

¶ 48     Turning to the State's averment that "forfeiture is a limitation on the parties and not the courts." The citation to *Madison H.* for this proposition shows a shallow understanding of what our supreme court in that case actually said and what the court has pronounced since. In *Madison H.*, our supreme court found unique factual circumstances not present here that allowed forfeiture to be overlooked in the interest of reaching a just result. *Madison H.*, 215 Ill. 2d at 371. In *Jackson v. Board of Election Commissioners of City of Chicago*, the court admonished reviewing courts that the oft-cited proposition does not abrogate standard waiver

- 13 -

and forfeiture principals and "should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will." *Jackson*, 2012 IL 111928, ¶ 33. The State's overbroad assertion ignores this admonishment.

¶ 49    Finding no forfeiture, we now dispose of the State's contention that *res judicata* and forfeiture apply. Issues previously raised on direct appeal are barred from postconviction consideration by the doctrine of *res judicata*, and those issues that could have been raised, but were not, are considered forfeited. *People v. Williams*, 209 Ill. 2d 227, 233 (2004). However, the doctrines of *res judicata* and forfeiture will be relaxed when one of the following three circumstances is present: (1) where fundamental fairness so requires; (2) where the forfeiture stems from the ineffective assistance of appellate counsel; or (3) where facts relating to the claim do not appear on the face of the original appellate record. *People v. English*, 2013 IL 112890, ¶ 22; *Blair*, 215 Ill. 2d at 450-51.

¶ 50    Defendant's postconviction petition was wholly based on information absent from the original appellate record, and thus could not have been raised on direct appeal. For a reviewing court to engage in a meaningful review of whether failing to call an expert witness constituted ineffective assistance of counsel, the testimony of the expert would undoubtedly prove helpful to the disposition of the claim. See *People v. Veach*, 2017 IL 120649, ¶¶ 46-47 (noting ineffective assistance of counsel claims may be better suited to collateral proceedings when the record is incomplete or inadequate for resolving the claim). Three separate doctors testified regarding matters that were not heard during the bench trial. Therefore, it was proper to bring such a claim on collateral review rather than on direct appeal. See *People v. Ligon*, 239 Ill. 2d 94, 105 (2010) (where record is insufficiently developed to assess counsel's

- 14 -

effectiveness, an ineffective assistance claim is properly brought in collateral proceedings, not direct appeal).

¶ 51    Next, we turn to defendant's claim that the dismissal of his postconviction petition alleging ineffective assistance of counsel was manifestly erroneous. The Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a three-stage process for defendants who allege a substantial deprivation of their constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26. A postconviction proceeding is a collateral attack on the trial court proceedings. *People v. Johnson*, 191 Ill. 2d 257, 268 (2000). In this case, the petition advanced to a third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2016). Following an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). Here, the court heard witnesses and made credibility determinations at the third-stage evidentiary hearing. Accordingly, the standard of review is whether the ruling was manifestly erroneous. See *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009) (stating manifest error exists when the error is clearly evident, plain, and indisputable).

¶ 52    Claims of ineffective assistance of counsel presented in a postconviction petition are judged under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by *People v. Albanese*, 104 Ill. 2d 504 (1984). The petitioner must show (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687-88; *People v. Brown*, 236 Ill. 2d 175, 185 (2010). A reviewing court need not "determine whether counsel's performance was deficient before examining the prejudice suffered" by defendant. *Strickland*, 466 U.S. at 697.

¶ 53    The circuit court, in the written order, found "[d]efendant was not prejudiced by the lack of blackout intoxication evidence." In establishing prejudice, a defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *People v. Haynes*, 192 Ill. 2d 437, 473 (2000). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 54    The court's finding that the defendant could not satisfy the second prong of *Strickland* was not manifestly erroneous. As the court stated, it was established at trial that the victim "had drank to excess, had become woozy and dizzy, and vomited as a result of the excess intake of alcohol." This was memorialized in the credibility findings. Further, the victim's testimony was not the sole testimony weighed by the court during the bench trial. The circuit court, in its written order, found that Dr. Best's testimony supported the victim's assertions. Moreover, defendant's testimony was found to be "inconsistent" and "incredible" based upon contradictions by other witnesses.

¶ 55    In analyzing this issue, we find it intriguing defendant has decided to argue the victim "blacked out" during the incident, especially when his defense during the bench trial was that the victim had consented to the sexual conduct. While succeeding in proving the victim was more intoxicated than initially assumed (.193 to .230 whole blood alcohol content compared to .11 to .12), it is important to realize that such an argument is two-fold. A realization of the gravity of such an argument would be informative as to why the panel in the direct appeal included the footnote stating neither side had argued the impact intoxication had on the victim's ability to give consent. *Pellegrini*, 2016 IL App (3d) 150802-U, ¶ 49 n. 2. While establishing a "blackout" may impact the credibility of the victim's testimony, it would

clearly prevent her from consenting to any sexual act perpetrated upon her by the defendant. See *People v. Brown*, 2013 IL App (2d) 110303, ¶ 52 (finding criminal sexual assault statute places no limitation on the reason for the victim's inability to give knowing consent); *cf. People v. Roldan*, 2015 IL App (1st) 131962, ¶¶ 21-23 (finding a lack of evidence that victim was in a "blackout" state precluded the trial court from concluding she could not knowingly consent). As the State points out, one of the main issues in the bench trial was whether the victim consented to sexual conduct with defendant. Establishing the victim could not have knowingly given consent to the sexual conduct in question by being so intoxicated she "blacked out," only solidifies the conclusion that there is no reasonable probability the result of the proceedings would have been different. Such testimony at the original trial would have only buttressed the conviction of defendant.

¶ 56        Defendant goes on to argue that the prosecution at the original trial was waiting for, and was prepared to respond to, the expert testimony regarding the intoxication of the victim. This is not remarkable. In presenting this testimony, defendant would have essentially performed the function of the prosecution by showing the victim was incapable of consent, undermining his own defense. At the very least, what the prosecution was likely lying in wait with was an objection that Locker was not qualified to opine on the reliability of the victim's testimony. At most, the prosecution was prepared to present evidence of defendant's particular knowledge of the victim's inability to give knowing consent. See *Roldan*, 2015 IL App (1st) 131962, ¶ 19 (noting the focus is on what the defendant knew or reasonably should have known regarding the victim's willingness or ability to give knowing consent); see also 720 ILCS 5/4-5 (West 2012) ("Knowledge of a material fact includes awareness of the substantial probability that the fact exists."); *People v. Ortiz*, 196 Ill. 2d 236, 260 (2001)

- 17 -

(stating knowledge is often proven by circumstantial evidence, but the State must present sufficient evidence from which an inference of knowledge can be made).

¶ 57 Here, defendant knew his wife was extremely intoxicated or at least was aware of the substantial probability that she was. This is laid bare by the facts presented during the bench trial. The victim vomited in the backyard when the group returned home from the festival. The victim then had to be assisted inside the home. Later, the victim locked herself in the bathroom from which she had to be extricated and then assisted to the bedroom. In explaining the situation to Sergeant Allbert, defendant stated the victim was "wasted" and that she was "drunk" from when they went out that evening. The defendant had numerous reasons to believe the victim was unable to give consent and should have abstained from engaging in any sexual contact with her. See *Roldan*, 2015 IL App (1st) 131962, ¶ 19. Had defendant's trial counsel presented the "blackout" testimony, defendant would likely be arguing that doing so was ineffective assistance of counsel. Accordingly, the circuit court's decision was not manifestly erroneous.

¶ 58 Defendant also avers the lower court misapplied *Strickland* in analyzing his ineffective assistance of counsel claim. In addition to stating the defendant was not prejudiced by the lack of "blackout" testimony, the court also stated, "[t]his Court has now heard the alcohol blackout testimony and finds that it would not have changed the verdict." As previously discussed, the defendant need not convince the court that the verdict would have been different but need only show a reasonable probability that the outcome would be different. *Supra* ¶ 54. However, it is the judgment of the circuit court, not its reasoning that is on appeal. We may affirm judgment "upon any ground warranted, regardless of whether the

lower court relied on it" even if we conclude that the court's reasoning was incorrect. *People v. Everette*, 141 Ill. 2d 147, 158-59 (1990).

¶ 59 As described above, the absence of the "blackout" testimony was not prejudicial. Moreover, the failure by defense counsel to introduce expert testimony that the victim "blacked out" when defendant's sole defense at trial was consent did not constitute deficient performance. Because our review reveals defendant cannot meet either prong of *Strickland*, it is of no consequence whether the court below misstated the standard.

¶ 60 In relation to this argument, defendant also argues the trial court erred in assuming that it would act as the future finder of fact when applying the *Strickland* standard. Conspicuously, defendant cites no authority in support.

¶ 61 At a third-stage evidentiary hearing, the court serves as the finder of fact. *People v. Domagala*, 2013 IL 113688, ¶ 34. "[T]herefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Id.* "[T]he circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief." *Id.* Defendant's argument on this point is without merit. The trial court did not err in dismissing defendant's postconviction petition.

¶ 62 B. Due Process of Law

¶ 63 Defendant argues that he was denied due process of law when the circuit court interjected personal knowledge into the final determination of his postconviction petition. The State argues the record belies this assertion.

¶ 64 A determination made by a trial judge based upon private investigation or private knowledge, untested by cross-examination or the rules of evidence, may result in the

deprivation of due process of law. *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962); *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 14. "Due process does not permit [a trial judge] to go outside the record, except for matters of which a court may take judicial notice, or conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence." *People v. Yarbrough*, 93 Ill. 2d 421, 429 (1982). "A trial judge does not operate in a bubble; [he] may take into account [his] own life and experience in ruling on the evidence." *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007). Reversal is only necessary when a trial court's reliance on matters outside the record is prejudicial to one of the parties. *People v. Banks*, 102 Ill. App. 3d 877, 882 (1981). Consequently, "[r]eliance on information found [outside] the record is not reversible error where there is no evidence that it either misled or entered into the trial court's determination." *Id.* A trial court will be accorded every presumption it considered only admissible evidence in reaching a conclusion. *Wallenberg*, 24 Ill. 2d at 354. "This assumption will be overcome only if the record affirmatively demonstrates the contrary, as where it is established that the court's finding rests on a private investigation of the evidence, or on other private knowledge about the facts in the case." *People v. Tye*, 141 Ill. 2d 1, 26 (1990). Whether a defendant's due process rights were violated is reviewed *de novo*. *People v. Guzman*, 2015 IL 118749, ¶ 13.

¶ 65       Defendant contends that when the court stated, "This Court, like all courts hears multiple cases and much testimony by and from witnesses who have drank alcohol to excess or observed others who had drank alcohol to excess[,]" it relied on its own personal opinion and matters outside the record. Defendant analogizes his situation to *People v. Wallenberg*, 24 Ill. 2d 350.

¶ 66     In *Wallenberg*, the defendant testified his truck had a flat tire. *Id.* at 352. As he traveled down a stretch of road, he was unable to find a gas station. *Id.* at 353. The trial court, in declaring its judgment, remarked that, although the defendant stated that he found no gas stations along that stretch, "I happen to know different. I don't believe his story." *Id.* at 354. However, no evidence contradicting the defendant's testimony was in the record. *Id.* Our supreme court found the trial court improperly made a determination based upon its private knowledge instead of on the record before it. *Id.* Therefore, the presumption that the trial court considered only admissible evidence was rebutted. *Id.*

¶ 67     The instant case is distinguishable from *Wallenberg*. Unlike *Wallenberg,* the comment here was innocuous and did not form the basis of the court's finding. When the remark is viewed within the context of the entire opinion, it takes on the character of a benign comment which did not form the basis of the court's conclusion. We agree with the State that defendant's argument finds no support in the record. The circuit court's written order showed that it thoroughly analyzed Fromme's testimony about the victim's intoxication and mental capacity, as well as Lank's testimony about the extrapolation of the victim's blood alcohol content. While defendant established the victim's whole blood alcohol level was higher than what was posited during the bench trial, the circuit court reiterated it was aware the victim had consumed alcohol to excess and exhibited certain symptoms as a result. The court still found the victim testified credibly about the specific facts pertaining to the incident and found defendant's testimony incredible. The court did not resort to its own personal knowledge and clearly pointed to corroborating testimony that supported the victim's testimony. A general proclamation regarding the fact that it is common for judges to hear testimony from witnesses that had consumed alcohol in excess, or observed others who had,

is not sufficient to rebut the presumption only admissible evidence was considered. The comment by the circuit court was not error and did not prejudice the defendant. Accordingly, defendant was not deprived his right to due process.

¶ 68                                   III. CONCLUSION

¶ 69         For the foregoing reasons, we affirm the judgment of the circuit court of Grundy County.

¶ 70         Affirmed.