NOTICE

Decision filed 11/23/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190251-U

NO. 5-19-0251

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 18-CF-44 |
| | ) | |
| ANTHONY R. WILLIAMS, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*: In this direct appeal, the defendant's six convictions and accompanying sentences are affirmed. With regard to the convictions, there is no merit to the defendant's contention, raised for the first time on appeal, that the trial judge erred when he relied on his personal knowledge of general farming practices in southern Illinois in discrediting the defendant's testimony and finding him guilty, because defense counsel invited the error now complained of, and because even if one were to assume, *arguendo*, that no invited error occurred, the trial judge did not err when he used his own general, preexisting knowledge, rather than undertaking an independent investigation of the specific facts of this case, or relying upon personal knowledge of the specific facts of this case. Moreover, the evidence of the defendant's guilt was overwhelming and therefore the defendant cannot show prejudice. With regard to the defendant's sentences, the defendant has not shown that he was unduly prejudiced by any errors that might have occurred at his sentencing hearing.

¶ 2   The defendant, Anthony R. Williams, appeals his convictions and sentences, after a bench trial in the circuit court of Jefferson County, for the offenses of criminal sexual assault and

1

aggravated criminal sexual abuse. For the following reasons, we affirm the defendant's convictions and sentences.

¶ 3                                   I. BACKGROUND

¶ 4      On January 29, 2018, the defendant was charged, by information, with two counts of criminal sexual assault and four counts of aggravated criminal sexual abuse. Count I alleged that the defendant committed criminal sexual assault in that between January 23, 2003, and January 22, 2007, the defendant, who was "a family member of A.H., committed an act of sexual penetration with A.H., who was under 18 years of age when the act was committed, in that the defendant placed his penis in the vagina of A.H." Count II alleged that the defendant committed criminal sexual assault in that between January 23, 2003, and January 22, 2007, the defendant, who was "a family member of A.H., committed an act of sexual penetration with A.H., who was under 18 years of age when the act was committed, in that the defendant placed his penis in the mouth of A.H." Count III alleged that the defendant committed aggravated criminal sexual abuse in that between January 23, 2003, and January 22, 2007, the defendant, who was "a family member of A.H., committed an act of sexual conduct with A.H., who was under 18 years of age when the act was committed, in that the defendant knowingly fondled the breasts of A.H., for the sexual gratification of the defendant." Count IV alleged that the defendant committed aggravated criminal sexual abuse in that between January 23, 2003, and January 22, 2007, the defendant, who was "a family member of A.H., committed an act of sexual conduct with A.H., who was under 18 years of age when the act was committed, in that the defendant knowingly fondled the genitals of A.H., for the sexual gratification of the defendant." Count V alleged that the defendant committed aggravated criminal sexual abuse in that between August 1, 2016, and October 5, 2016, the defendant, "who was 17 years of age or older, committed an act of sexual conduct with H.H., who was under 13 years of age, in that the defendant knowingly fondled the breast of H.H. for the

2

sexual gratification of the defendant." Count VI alleged that the defendant committed aggravated criminal sexual abuse in that between August 1, 2016, and October 5, 2016, the defendant, "who was 17 years of age or older, committed an act of sexual conduct with H.H., who was under 13 years of age, in that the defendant knowingly fondled the vagina of H.H., through clothing, for the sexual gratification of the defendant."

¶ 5    The defendant was arrested, and counsel was appointed to represent the defendant. Counsel filed a motion for a reduction in bond and for discovery. Counsel did not file a bill of particulars or any other motion to request more specificity prior to trial about when or where the six alleged offenses occurred. On February 23, 2018, the defendant was indicted on the same six charges. On May 30, 2018, the defendant executed a signed waiver of jury trial, which included a request for a bench trial.

¶ 6    On June 12, 2018, the defendant's bench trial began. The first witness to testify was Dr. Musheni Nsa. Dr. Nsa testified that she was a pediatrician who was visited by H.H. on or about October 5, 2016. She testified that H.H.'s appointment was for "a routine well visit, yearly physical." She testified that she asked H.H., who was 11 years old at the time of the visit, one of Dr. Nsa's routine questions, which was whether there were any concerns about abuse at H.H.'s home. Dr. Nsa testified that in response to the question, H.H. "looked sad and was tearful." H.H. thereafter told Dr. Nsa and H.H.'s mother, who was also present, that " 'Grandpa's been touching me.' " Dr. Nsa testified that, with H.H.'s mother's permission, Dr. Nsa then interviewed H.H. with only Dr. Nsa and her nurse present, at which time H.H. told Dr. Nsa and the nurse that H.H.'s grandfather had "been touching her chest area and then her private area," the latter of which Dr. Nsa testified she understood to mean H.H.'s genital area. Dr. Nsa thereafter contacted the Illinois Department of Children and Family Services (DCFS) and the police. On cross-examination, Dr.

3

Nsa testified that she had not met H.H. prior to the October 5, 2016, visit, and described more details about the visit.

¶ 7 The next witness to testify was Jeff McElroy, who testified that he was a child protection service worker, also known as an investigator, with DCFS, and had been for 18 years as of the time of the trial. McElroy testified that on October 5, 2016, he was dispatched from his office by his supervisor to respond to a hotline call received from Dr. Nsa's office. After speaking with Dr. Nsa, he spoke with H.H., who he described as the defendant's step-granddaughter. McElroy testified that he told H.H. that a "child-sensitive interview" would be set up at the Amy Center, a child advocacy center in Mt. Vernon. He testified that he was in an observation room, watching the interview, when H.H. was interviewed in a different room at the Amy Center. He testified that after the interview, he went to H.H.'s parents' home, where the defendant had been residing as well. The defendant agreed to be interviewed at the Mt. Vernon Police Department but did not make any admissions during that interview. McElroy testified that he subsequently spoke with one of the defendant's children, a daughter, who denied being touched by the defendant. He testified that thereafter he spoke to the defendant's son, who told McElroy that there were "other family members that might be willing to come forward to talk about other issues of prior abuse." He testified that he subsequently spoke with A.H., the defendant's niece, who was hesitant at first but thereafter told McElroy about incidents of abuse she had suffered.

¶ 8 On cross-examination, McElroy testified that he also contacted another one of the defendant's daughters. He testified that an additional young woman, T.H., also resided part time at the home at which H.H., and the defendant, had been living. He believed T.H. was 14 years old at that time. He testified that the defendant was in the process of moving out of the house when McElroy visited it. When asked if the defendant was moving out because of the allegations made that day by H.H., McElroy testified that he believed the defendant was moving because "this was

4

an argumentative, you know, disagreement, 'I want you out of my house' moving." He agreed it "was kind of a sudden change of plans." He testified that while at the Mt. Vernon Police Department, he interviewed, separately, both the defendant and the defendant's wife, both of whom denied there were "any issues." The defendant informed McElroy that the defendant had been accused of sexual abuse before. McElroy testified that an investigation had been conducted approximately six months prior to H.H.'s allegations, and that the report in that case had been resolved as unfounded. On redirect examination, McElroy testified that in addition to the previous allegations just discussed, another report, that was ultimately resolved as unfounded, was made by the defendant's oldest daughter "a long time previously." McElroy testified that A.H. had also informed him of possible other victims of the defendant.

¶ 9    Detective Corporal Jeremy Reichert testified that he was a detective with the Mt. Vernon Police Department, and that for the previous 12 years he had been the department's primary investigator on child sexual abuse cases. He testified that on the day H.H. made her allegations at Dr. Nsa's office, Reichert was with McElroy in the observation room during H.H.'s interview at the Amy Center, and that he conducted the police station interview with the defendant on that date. He testified that the defendant did not make any admissions during that interview. He testified that he was also present during the interview with A.H., who was now an adult and who "described several incidents of sexual abuse by [the defendant] when she was a child." He described A.H. as "[v]ery cooperative but almost timid," and added that he could "tell it was stressful to her." Reichert testified as to additional interviews he did with A.H., the defendant, and other family members. He testified that A.H. told him that the family had a farm near Ina, and told him that all of the sexual abuse incidents reported by A.H. "happened at different locations on the family's property." Reichert testified that after his second interview with A.H., he conducted a second interview of the defendant. He testified that the defendant again denied that the incidents took

5

place. Subsequently, Reichert testified that A.H. at one point expressed frustration to him that she had reported the defendant's abuse of her to other family members, and that despite that, the problem "wasn't take care of."

¶ 10    Crystal Williams testified that she is H.H.'s mother and is married to one of the defendant's sons, which she agreed made the defendant H.H.'s step-grandfather. She testified that T.H. was her other child. Crystal testified that H.H. was "a very outgoing girl," who liked to do tumbling and dance. She testified that H.H. was also very musical and was a "straight A" student. She testified that between August and October of 2016, the defendant lived with Crystal's family, including H.H., at Crystal's previous home in Mt. Vernon. With regard to H.H.'s medical appointment on October 5, 2016, Crystal testified that H.H. stated, " 'grandpa's been touching me.' " She testified that while she and H.H. were alone, H.H. told her the abuse had been occurring "since about the beginning of school," which Crystal testified meant "about August." She testified that H.H. told her that at the house in Mt. Vernon, the defendant, when tucking H.H. into bed at night, "put his hands down her shirt on her newly-developing breasts and that then after he would do that, he would slide his hands down her body to her vagina area above her pants or underwear, her pajamas or whatever she had on." Crystal testified that H.H. told Crystal "that wouldn't last very long at all, but then he would continue to tuck her in and say, 'We're all good, right? We're all buddies, aren't we?' and leave the room." Crystal testified that the defendant tucked H.H. into bed every night.

¶ 11    H.H. testified that she was 12 years old at the time of the trial. She testified that Crystal Williams was her mother, and that T.H. was her sister who sometimes lived with her. She testified that the defendant was her step-grandfather, and that he had touched her at the home in which H.H. had previously lived in Mt. Vernon. She testified about her disclosure to Dr. Nsa and then interacting with the police and DCFS. With regard to the abuse, she testified that the defendant

6

"would come into my—to my room, and he would tell me to either pull down my pants or lift up my shirt, and he would take his hand and touch my breasts and my vagina." She testified that the abuse "would happen at nighttime and daytime." She thereafter testified that the defendant touched her breasts under her clothing and touched her vagina over her clothing. She testified that the abuse occurred more than once, over a period of around two months, and always happened in her bedroom. H.H. testified that other people were sometimes in the house, and that the defendant's youngest daughter was sometimes in the bedroom. She testified that if someone was coming, the defendant's abuse happened quickly, but that "[i]f someone was not coming, slowly."

¶ 12    Michael E. Williams testified that he was born in 1957 and lived near Ina. He testified that A.H. is his daughter and that the defendant is his brother. He testified that he had "spent a lifetime with" the defendant and agreed that the two had lived very physically close together for some time. He testified that "[m]ost of [his] life," he had had a good relationship with the defendant, aside from "a few disagreements, like most brothers will have." He described A.H. as a very helpful daughter who helped him with his other children, and also described her as "always very truthful" and matter of fact. Michael testified that the defendant lived a "[q]uarter of a mile south" of the farm on which Michael lived. He testified that A.H. spent time with the defendant, because Michael's mother "had them to take food to the field." He testified that the defendant had a key to Michael's home, because it was "very accessible to the farm." He testified that he never observed inappropriate behavior by the defendant toward A.H., but that A.H. told Michael "that she didn't like what the defendant was doing." He testified that he assumed she was speaking of the way the defendant disciplined her, and that he told her that if she thought the defendant was doing something wrong, she should "bring me some evidence."

¶ 13    A.H. testified that at the time of the trial, she was 29 years old, had been married for 5 years, and had 2 children. She testified that when she overheard a conversation in which the 2016

allegations against the defendant were being discussed, she contacted Crystal privately. She testified that, thereafter, Crystal asked A.H. if A.H. would be willing to speak to a DCFS investigator and that A.H. agreed to do that. She testified that she spoke with Jeff McElroy and later spoke with a second law enforcement officer.

¶ 14    A.H. was then asked what her "life was like back around 2003 to 2007." She testified that she lived with her father, Michael, on the family farm, and that she was around 14 to 17 years old during the period of time from 2003 to 2007. She testified that the defendant, Michael, and A.H.'s grandmother all worked on the farm, and that A.H. helped on the farm too. She testified that "[e]verybody had a job on the farm," and that she was sometimes alone with the defendant. A.H. testified that she noticed a gradual change in the defendant's behavior as she got older, and that "I would notice that he would want me, or he would choose me to go with him and help him in the field." When asked about inappropriate behavior by the defendant in around 2003, she testified, "He would just touch me inappropriately, bump against me inappropriately." She testified that it "escalated" and that "[s]ince we started spending time alone, he just started touching me more. It slowly graduated to sexual intercourse, oral intercourse." She thereafter testified that the defendant touched her breasts with his hands, touched her "in [her] private area between [her] legs" with his hands, and eventually began having sexual intercourse with her. When asked if there was a place "this typically occurred," she testified, "Not really. It was just wherever we were alone, usually somewhere on the farm, secluded." When asked for examples, A.H. testified, "We have a shed that we keep our grain in. It was very secluded because there [were] tractors and stuff parked in front of it. He was usually the only one that went and fed the animals, so there was one spot. The barn always had the grain trucks parked in there, so it's easy to get behind one of them. They're very tall. You can't see around them."

¶ 15    A.H. could not recall where the first incident of sexual intercourse occurred but testified that thereafter the incidents happened "[a]nywhere on the farm." She added, "I mean, it was every day almost, unless I was on my period. Behind the grain wagons, in the feed shed, even in the field." She testified that the defendant would pull her pants down, and that she would leave her shirt on. She clarified that when she testified as to sexual intercourse, she meant that the defendant placed his penis in her vagina. She testified that the defendant also put his penis into her mouth, and this too happened at various secluded areas of the farm. She further testified that this also happened one time at Michael's house. She testified that the abuse ended when she was a freshman in college.

¶ 16    On cross-examination, she testified that other people's homes were near various parts of the farm, but that the fields were connected in such a way that she could walk from Micheal's house to where the defendant lived at that time, without using the road. She testified that she had not spoken with either H.H. or T.H. She also testified in detail about the location of some of the sexual assaults, and testified about how the defendant used grain wagons "like a shield" to hide the assaults, because that way if anyone were passing by on the road, they could not see the defendant sexually assaulting A.H. She testified that there were wooded areas behind some of the fields, and that "we didn't have fields that lined up against each other." She testified that sometimes she and the defendant would be in a tractor or combine together, and he would have her unbutton her shirt. She testified that the last sexual assault of her by the defendant was the one that happened at her father's house, when she was a freshman in college. When asked if the defendant was circumcised or uncircumcised, she testified, "He's uncircumcised." On redirect examination, she clarified that when the last assault occurred, she was over age 18, and that the present charges, and the rest of her testimony, encompassed only the assaults that occurred when she was between ages 14 and 17. Following A.H.'s testimony, the trial judge recessed the case for the day.

¶ 17     The following morning, June 13, 2018, the bench trial resumed. The State recalled A.H. to the witness stand to provide additional testimony. Prior to A.H.'s additional testimony, the State asked A.H. if it was true that A.H. had approached the victim advocate that morning, very upset, and told her that she had answered one of the questions on cross-examination incorrectly. A.H. testified that this was true. The State asked A.H. which question it was. A.H. testified that it was the question about whether the defendant was circumcised or not. She thereafter testified that the defendant was circumcised. She reiterated that her testimony about the acts of sexual assault by the defendant was correct. She further testified, "It would occur almost every day. It didn't matter where. It didn't matter when. His wife worked at Sears so she was gone almost eight hours a day." She added, "Grandpa was getting bad with diabetes so, therefore, he was losing his eyesight, and he was less and less on the farm, so there was more and more opportunities because there was less people on the farm."

¶ 18     After A.H. testified, the State rested its case. Counsel for the defendant then asked for the trial to recess, because A.H.'s "180 degree turn on her testimony on what I felt was a very important point in her testimony—that alters and affects pretty much everything about our case-in-chief as the defense." He stated that he wanted time with his client to reassess their strategy, including the defendant's possible testimony and counsel's closing argument. Without objection from the State, the trial judge agreed to recess the trial.

¶ 19     On July 2, 2018, the bench trial resumed. Counsel for the defendant made a motion for a directed verdict, which was denied. The defendant then testified. He testified that he was 58 years old and had lived "[a]ll of" his life on or around the family farm near Ina. He described the farm as comprising a total of 750 acres, "in different spots" that were not all connected, with farmable areas, wooded areas, buildings, a roadway, and creeks. He testified that during the time of the acts alleged by A.H., a total of 10 people resided on the farm, in three different households. He

described two of the households as being "maybe a hundred or two" yards apart, with his own household being "about a half mile to the south." He testified that other houses, not inhabited by family members, were also in the area, between some of the family households.

¶ 20    The defendant thereafter described more about the layout of the farm. When asked about "outbuildings" near the house the defendant lived in at that time, the defendant testified, "there's the old chicken coop and the crib and the garage and then an old barn, and then there's what they call the laying area where the chickens used to lay the eggs, so that would be one, two, three, four, five—five buildings—six maybe." When asked about outbuildings near the house his mother and father lived in at the time, the defendant testified, "there's the old machine shed, the new machine shed, and then several bins. I'd have to count them up." When asked about outbuildings near the house the defendant's brother lived in at the time, the defendant testified, "Around my brother's is just basically nothing but old cars and stuff like that, maybe one outbuilding or two." He described the farmland as "fairly flat," with "some rolling to it," and testified that access to the various areas was by means of "regular roads."

¶ 21    The defendant testified there were "several different" roads in the area, and that during the time in question, other people farmed areas up to and including parts of his family farm. He testified that "you also have hunters that you never know is going to be in and out or whatever," and described "deer hunters, squirrel hunters, [and] game hunters" as appearing on the farm at various times of the year. When asked to comment on A.H.'s testimony about the location and frequency of the sexual assaults of her by the defendant, the defendant testified, "you just wouldn't do that out there because I can tell you we—you know, she's going to object, but there's several times whenever you'd be farming and you didn't know anybody was absolutely around." He added, "I've had more than once when I was combining and somebody would just run up and jump on the combine, and I had no idea that anybody was around." When asked for an example of this,

11

he described one occasion when someone who hunted on the property approached the defendant while the defendant was on a combine and asked permission to bring other people to hunt there. The defendant also testified that he had unexpected interactions with neighbors, "because four-wheelers get you in and out of different places quicker and quieter than you know."

¶ 22    When asked for another example of this, the defendant testified that he would sometimes go to other farms to check their rain gauges. He did not clearly testify that other farmers sometimes came to his farm to do that too. He testified about the various crops grown on the farm and why crops needed to be checked on "daily." He testified that his neighbors were in their fields on a daily basis too. Again asked about A.H.'s accusations, the defendant testified "there's not a good place to hide on a tractor," and, with regard to the allegations involving outbuildings, he testified, "It's just not something I would try to do because you just don't know who's coming in or out because you've got seed dealers, you've got implement dealers coming by." When asked how frequently such dealers would "stop by," he testified, "Well, it was never a set deal. You just didn't know." He testified that sometimes the farm had hired hands as well. He testified that he was circumcised.

¶ 23    On cross-examination, the defendant agreed that during the four-year time period in question, A.H. spent time working on the farm, and he testified that he "probably" was alone with her at times, stating, "I probably was alone with her, but, I mean, if I was, it was not in a building or at her house or anywhere by myself with her." He agreed that seed and implement dealers did not appear on the farm on a daily basis. He further agreed that neighbors would not come to check on his tractors every time a tractor was standing still. On redirect examination, the defendant could not describe how much he saw A.H. during the four-year time period in question. He agreed that he did not deny that he was sometimes alone with A.H. during that period, but testified that he also did not know how much time he spent alone with her during that time. He added, "I never tried to

12

be alone with her at any time." When asked how frequently he was alone with A.H. for more than 10 minutes, the defendant testified, "I would say less than *** once a week." He testified that he saw less of A.H. as she got older and began working outside of the farm, so at that point he was alone with her even less. The defendant did not testify at all about the allegations made by H.H.

¶ 24 Following the defendant's testimony, the defense rested. In closing argument, counsel for the defendant argued, *inter alia*, that the State had not met its burden of proof with regard to the charges involving either H.H. or A.H. With regard to H.H., he argued, *inter alia*, that he believed H.H. had been coached by her mother and was not credible for other reasons. Following a brief recess during closing argument, the trial judge gave defense counsel the opportunity to begin his argument again or pick up where he left off prior to the recess. Defense counsel stated that he did not believe he needed to start over, especially because the trial judge would "have a transcript to review" of the argument prior to making his ruling. The trial judge responded, "I will." Thereafter, with regard to A.H., defense counsel argued that the defendant's testimony was "a lot more logical" and made "a lot of sense," whereas the testimony of A.H. was, in essence, vague and at times contradictory. Counsel thereafter argued that the defendant's "details are a lot more believable as far as what transpires on a farm life from day-to-day," and that counsel believed that "from the totality of [A.H.'s] testimony versus [the defendant's] testimony describing life on the farm, that [the defendant] has accurately described life on the farm here." The State, on the other hand, disputed the idea that the defendant's testimony was "logical," and argued that by contrast, A.H.'s testimony made sense and was logical. The State also argued that H.H.'s testimony was quite credible and should be believed as well.

¶ 25 The trial judge took the matter under advisement, noting that he wished "to review the transcript of everyone's testimony and the arguments but chiefly the testimony, and [to] review [his] notes" before making his ruling. On July 26, 2018, the trial judge entered a judgment order

in which he found, *inter alia*, that (1) the testimony of each of the State's witnesses, including H.H. and A.H., "was credible and reasonable," (2) the testimony of H.H. and A.H. "was solid and quite courageous," and (3) "the testimony of H.H. and A.H. bolstered each other's credibility." Thereafter, the trial judge made the following additional finding:

> "The testimony of the Defendant was not credible. It consisted mostly of a detailed explanation of why no one could have committed the offenses against A.H. on a working farm as she had claimed. According to the Defendant there was an almost constant presence of seed salesmen, farm implement dealers, farm hands and concerned neighbors in and around the places where A.H. alleged the defendant committed his crimes against her, thereby making such acts virtually impossible to carry out without discovery. The Court knows this assertion to be largely, if not entirely, without basis because the Court was literally born and raised on a farm and is still a part of an extended farm family and the farming industry of Edwards, White, Wayne and Washington counties and is therefore quite familiar with the work habits and practices of law-abiding southern Illinois farmers and farm industry personnel. The Defendant's contention was not confirmed by any other evidence."

¶ 26    The judgment order thereafter stated that the State had "proved its case beyond a reasonable doubt on each and every count" with which the defendant was charged. Accordingly, the judgment order stated that the defendant was guilty of all six counts. A presentence investigation was ordered, with sentencing to follow.

¶ 27    On August 22, 2018, the defendant filed a motion to reconsider judgment, or in the alternative, motion for a new trial. Therein, he asked the trial judge to reconsider his ruling in light of the fact that no physical evidence was presented with regard to any of the six counts. He also asked the trial judge to reassess the amount of weight to be afforded to the testimony of each

witness, arguing, as he did at trial, that the State's key witnesses were not credible. He did not claim that the trial judge erred by considering his own knowledge of farming when finding that the defendant lacked credibility. On September 5, 2018, the defendant filed an amended motion that differed from the original motion in no ways that are material to this appeal.

¶ 28 On October 25, 2018, a hearing was held on the amended motion to reconsider, or in the alternative, motion for a new trial. Following argument by the parties, which was consistent with the allegations in the amended motion and therefore did not ask the trial judge to consider whether he had erred by considering his own knowledge of farming when finding that the defendant lacked credibility, the defendant's request for relief was denied. Immediately thereafter, the defendant's sentencing hearing began. When asked if there was evidence the State wished to present in aggravation, the State asked to present five victim impact statements. Thereafter, statements were read into the record by, or on behalf of, Crystal Williams, T.H., H.H., A.H., and an individual with the initials L.M., who was not present because she resided in Maryland, and whose statement was read into the record by a victim advocate.

¶ 29 Of relevance to this appeal, T.H. claimed in her statement that she was "also a victim of" the defendant. She asserted that when she was about 13 years old, "the abuse started," and "happened every night." She claimed that when the defendant tucked her into bed when she was at Crystal's home in Mt. Vernon, he would touch her, although she did not describe the touching in any detail and did not claim that it involved the defendant touching her breasts, her vagina, or any other specific area of her body. L.M. claimed in her statement that when she "was somewhere between the ages of 9 and 12," her cousin, the defendant, was between 24 and 27 years old, and "molested" her. She claimed that "[i]t happened one time." She did not describe what the defendant did to her, and did not claim, specifically, that it involved the defendant touching her breasts, her

15

vagina, or any other specific area of her body, or that it involved oral sex or sexual intercourse. Counsel for the defendant did not object to the presentation of any of the victim impact statements.

¶ 30 In mitigation, counsel for the defendant presented the testimony of the defendant's wife, who testified that her health problems required her to depend on the defendant for extensive help with activities of daily living. Thereafter, the parties presented argument. The State referenced the five victim impact statements and argued that "we have a span of 25 years of victims." The State asked for a combined sentence, on the six counts, of approximately 44 years of imprisonment. Counsel for the defendant contended, *inter alia*, that the trial judge should consider the "excessive hardship" that the defendant's wife, in light of her health problems, would face if the defendant were sentenced to a long term of imprisonment, and that the trial judge should find that "the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime."

¶ 31 Following the arguments presented by the parties, the defendant declined to make a statement in allocution. Thereafter, the trial judge stated that he had "considered the victim impact statements presented by the five individuals, including the victims, the actual victims in this specific case, as well as three other people." He reiterated that he had considered the presentence investigation and noted that it "indicate[d] that the [d]efendant has no criminal history, no juvenile delinquent official criminal history, um, although that's otherwise than as is alleged by two of the persons making victim impact statements." He stated that he would find, in mitigation, the hardship that would be caused to the defendant's wife. He then stated the following:

> "I can make the finding that he has no official history of delinquency or criminal conduct because you don't. However, I'm not going to make the finding that you have led a law-abiding life for a substantial period of time because I have heard from other people here today as part of the victim impact statements that you have molested them, as well as the

16

fact that these allegations against you, for which you have been found guilty, are alleged to have occurred over a long period of time, so I can't make that—that part of that finding." The trial judge sentenced the defendant to what he termed a "total aggregate sentence" of 44 years of imprisonment, which, with the concurrent sentencing that was included on two counts, amounted to a 37-year sentence.

¶ 32　The defendant filed a motion to reconsider sentence, in which he contended, *inter alia*, that he had "no history of prior delinquency or criminal activity." He did not contend that the trial judge erred in considering the victim impact statements of T.H. and L.M. On June 17, 2019, a hearing was held on the defendant's motion to reconsider sentence. Arguments were presented that were consistent with the written motion; therefore the defendant did not argue that the trial judge erred in considering the victim impact statements of T.H. and L.M. Following arguments, the defendant's motion to reconsider sentence was denied. This timely appeal followed.

¶ 33　　　　　　　　　　　　　　　II. ANALYSIS

¶ 34　On appeal, the defendant asks this court to "remand for a new trial because the trial court relied on its personal knowledge of its own farm in discrediting [the defendant's] testimony and finding him guilty." In particular, the defendant contends that the trial judge considered information beyond that which was presented at the defendant's bench trial, and that in doing so, deprived the defendant of due process of law. The defendant further contends that reversal is required even if a trial judge does not give "controlling weight" to improper evidence, positing that even giving "very little weight" is improper and requires reversal. The defendant argues that although a trial judge is certainly entitled to weigh the credibility of a defendant, the weighing process cannot involve "private knowledge of the [trial judge] that is untested by cross-examination or any of the rules of evidence."

17

¶ 35    In the alternative, the defendant asks this court to remand for a new sentencing hearing, because he contends that at his sentencing hearing his "right to due process of law was violated when the trial court improperly considered the victim impact statements of" T.H. and L.M. He posits that the two statements in question "did not describe the impact of the current offenses on their lives, but instead, allowed them to allege new accusations against [the defendant that] he had no opportunity to rebut." He contends that it is not appropriate for a trial judge to consider a victim impact statement that describes not the impact of the current crime, but instead describes other alleged crimes that were never charged, and of which the defendant was never convicted. He concedes that the Illinois Supreme Court has held that a due process violation occurs only when a victim impact statement becomes so unduly prejudicial that it renders the sentencing proceedings fundamentally unfair, but contends that standard is met in this case. He contends that he was prejudiced by the trial judge's error because, according to the defendant, the trial judge used "[L.M.'s] statement to determine factors in aggravation." However, instead of noting a factor in aggravation, the defendant points to the trial judge's refusal to find, in mitigation, that the defendant "had led a law-abiding life" for a substantial period of time.

¶ 36    The State responds that both issues raised on appeal by the defendant are forfeited, because they were not raised by counsel for the defendant in the trial court. Thus, the State posits, they may be considered only under the plain-error doctrine, if at all. The State notes that the first step in a plain-error analysis is to determine if any error occurred, and that if a reviewing court concludes that no error occurred, there can be no plain error. With regard to the trial judge's use of his personal knowledge of farming, the State contends that any error that might have occurred in this case was harmless, further contending that the evidence against the defendant was overwhelming. The State posits, in essence, that even if the defendant's testimony about the farm were found credible and taken as true, it still would not negate all of the credible evidence of the defendant's

18

guilt, because the defendant's testimony means only that it would have been "difficult" for the assaults on the farm to occur as A.H. contended, not that it would have been impossible. In other words, there was nothing in the defendant's testimony that was incompatible with the trial judge's findings of guilt, especially in light of the fact that the defendant never denied, in his testimony, that the assaults took place. The State also points out that Illinois case law holds that a trial judge does not operate in a bubble and therefore may take into account the judge's own life and experience in ruling on the evidence. The State further posits that the trial judge's comments in this case "were innocuous and did not form the basis of the [trial judge's] finding" because the trial judge specifically found all of the State's witnesses to be credible.

¶ 37    With regard to the sentencing hearing, the State also argues for harmless error, as well as arguing that no error occurred at all. With regard to the latter argument, the State points out that the trial judge did in fact find that the defendant had no prior criminal history or history of delinquency, notwithstanding his refusal to also find that the defendant had lived a law-abiding life for a substantial period of time. The State posits that the evidence of record shows that the trial judge would have given the defendant the same sentences regardless of whether the judge had heard the two allegedly problematic victim impact statements.

¶ 38    In reply, the defendant argues for plain-error review in this case and posits that it is clear from the record that the trial judge's comments were not innocuous and did in fact form the basis for his findings of guilt. The defendant does not address the State's argument that a trial judge is not expected to live in a bubble and therefore may take into account the judge's own life and experience in ruling on the evidence presented to the judge. With regard to sentencing, the defendant reiterates his position that he was prejudiced by the trial judge's consideration of the statements by T.H. and L.M. because the trial judge specifically referred to them when stating that

19

he would not make a finding that the defendant had lived a law-abiding life for a substantial period of time.

¶ 39 We begin our analysis by noting that this court may affirm a trial judge's ultimate ruling on any basis supported by the record. See, *e.g.*, *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 418 (2007); *People v. Johnson*, 208 Ill. 2d 118, 134 (2003). We may do so because the question before us on appeal is the correctness of the result reached by the judge, rather than the correctness of the reasoning upon which that result was reached. *Johnson*, 208 Ill. 2d at 128. As the parties to this case agree, when a party "requests plain-error review of an alleged error, the reviewing court's first step 'is determining whether any error occurred.' " *People v. Mueller*, 2015 IL App (5th) 130013, ¶ 23 (quoting *People v. Thompson*, 238 Ill. 2d 598, 613 (2010)). In this case, however, we conclude for the reasons that follow that, although not raised by the State on appeal, the doctrine of invited error both eviscerates the defendant's first claim of error and precludes this court from conducting a plain-error review of that alleged error.

¶ 40 As this court has held, "under the doctrine of invited error, a defendant may not request to proceed in one manner and later contend on appeal that the course of action was in error." *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17. Moreover, the "invitation or agreement" by a defendant to a "procedure later challenged on appeal 'goes beyond mere waiver' " and instead means that "plain-error review is forfeited." *Id*. That is the case because the issue is seen "as one of estoppel." *Id*. "To allow a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal would offend notions of fair play and encourage defendants to become duplicitous." *Id*. It also creates a situation wherein the State does not have the opportunity to cure the alleged defect at the trial-court level. *Id*. As a result, the Illinois Supreme Court has repeatedly refused, in situations wherein a party has invited, or injected, error into proceedings, to undertake a plain-error analysis. *Id*.

20

¶ 41 As explained above, in closing argument at the defendant's bench trial, counsel for the defendant argued, with regard to the counts involving A.H., that the defendant's testimony was "a lot more logical" and made "a lot of sense," whereas the testimony of A.H. was, in essence, vague and at times contradictory. Although counsel certainly could have stopped there, and thereby limited his argument to the evidence presented during the bench trial, instead counsel thereafter argued that the defendant's "details are a lot more believable as far as what transpires on a farm life from day-to-day," and counsel stated that he believed that "from the totality of [A.H.'s] testimony versus [the defendant's] testimony describing life on the farm, that [the defendant] has accurately described life on the farm here." We can conceive of no reasonable way to construe these additional arguments of trial counsel other than as an invitation for the trial judge to compare the testimony of A.H. to that of the defendant with regard to the specific question of whose testimony was more believable in light of the day-to-day realities of a working farm in southern Illinois. Counsel was aware at the time he made these arguments that no evidence had been presented at trial as to this specific question. Accordingly, inherent in counsel's invitation to the trial judge to make this assessment was counsel's further invitation to the trial judge that he consider evidence outside of the record in so doing, for there was simply no evidence of record to support the aforementioned statements in counsel's closing argument. Although we decline to consider whether counsel's invitations would have warranted something as extreme as independent research on the part of the trial judge, or an independent visit to the crime scene or to any other working farm in the area, because, as discussed in more detail below, those questions are not before us, we believe that in light of the defendant's invitations that are before us, it would not be appropriate to find fault, under the unique circumstances of this case, with the trial judge for considering his own personal knowledge of general day-to-day farming practices as he assessed the defendant's testimony in comparison to A.H.'s testimony to determine whose testimony more

21

accurately described the day-to-day realities of a working farm in southern Illinois. Because defense counsel invited the error of which the defendant now complains, and pursuant to well-established case law, we conclude that the doctrine of invited error precludes plain-error consideration of the purported error.

¶ 42    In so doing, we note that any argument that the trial judge did not listen to defense counsel's argument closely enough to note counsel's invitation to the trial judge is belied by the fact that, as explained above, following a brief recess during closing argument, the trial judge gave defense counsel the opportunity to begin his argument again, or pick up where he left off prior to the recess. Defense counsel expressly stated that he did not believe he needed to start over, especially because the trial judge would "have a transcript to review" of the argument prior to making his ruling, to which the trial judge responded, "I will." It is also belied by the fact that, when taking the case under advisement, the trial judge stated that he wished "to review the transcript of everyone's testimony and the arguments but chiefly the testimony, and [to] review [his] notes" before making his ruling. Thus, the trial judge made it clear that he would closely study not only the testimony at trial but also the arguments of counsel, prior to issuing his ruling, and it is apparent from the record that he did both.

¶ 43    We further note that although it is not clear from the record whether the defendant's trial counsel[1] knew or did not know of the trial judge's background in farming, it is clear from the record that no objection to the trial judge's statements was made at the trial-court level, which strongly suggests that trial counsel realized he had injected any purported error into the proceedings and could not later complain thereof, a point that is particularly true if counsel injected

_____

[1]Documents included in the record on appeal demonstrate that at the time of the bench trial, the defendant's trial counsel was the public defender of Jefferson County. Presumably, therefore, he appeared before the trial judge on a regular basis and was at least somewhat familiar with the trial judge, which further suggests that he possibly knew of the trial judge's history in the farming business.

the error as a matter of trial strategy, with the calculated hope that the trial judge would, based upon his own personal knowledge of general farming practices, agree with the defendant's testimony and the defense theory that the offenses could not have happened as A.H. alleged, rather than disagreeing and discrediting the defendant. In short, having invited the trial judge to look beyond the evidence adduced at trial when making his ruling, the defendant cannot now complain if the trial judge, to a narrow extent, took him up on that invitation.

¶ 44    Moreover, even if we were to assume, *arguendo*, that the doctrine of invited error is not applicable in this case, the State is correct in its assertion, uncontested by the defendant on appeal, that a trial judge does not operate in a bubble and therefore may take into account the trial judge's own life and experience when ruling on evidence. See, *e.g.*, *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64. The well-established presumption that a trial judge has considered only admissible evidence when ruling is " 'overcome only if the record affirmatively demonstrates the contrary, as where it is established that the [trial judge's] finding rests on a private investigation of the evidence, or on other private knowledge of the facts in the case.' " *Id*. (quoting *People v. Tye*, 141 Ill. 2d 1, 26 (1990)). In this case, there is no allegation—and no factual support for any such allegation—that the trial judge conducted a private investigation of the evidence or relied upon private knowledge of the facts *in this case*. The only allegation is that he relied upon his own personal *preexisting* and *general* knowledge of working farms in southern Illinois. This is a much different proposition, as demonstrated by an analysis of the two cases discussed, and relied upon, by the defendant in making the allegations in his briefs on appeal.

¶ 45    In the first case discussed and relied upon by the defendant, *People v. Wallenberg*, 24 Ill. 2d 350, 353-54 (1962), the trial judge used his personal knowledge of *specific* facts *in that case* when the trial judge announced that he did not believe the defendant's story that he could not find a gas station along a certain stretch of road because the trial judge " 'happen[ed] to know

23

different' "—presumably meaning that the trial judge knew that there was in fact at least one gas station along that stretch of road. Because there was no evidence in the record to contradict the defendant's assertion, the Illinois Supreme Court found that the trial judge erred and that a new trial was required. *Id.* In the second case discussed and relied upon by the defendant, *People v. Dameron*, 196 Ill. 2d 156, 171 (2001), the defendant alleged that the judge overseeing his sentencing hearing relied extensively upon evidence outside of the record—a social science book and a transcript from an unrelated sentencing hearing—when sentencing the defendant to death. The Illinois Supreme Court agreed and found this to be erroneous because the sentencing judge "spoke at length about" information "he uncovered through his own investigation" (*id*. at 176), and because "[t]he judge's references to these sources show that he gave some weight to them" when fashioning the defendant's death sentence (*id*. at 179).

¶ 46 The present case is markedly different. Unlike in *Wallenberg*, in the present case, as explained above, there is no allegation that the trial judge possessed, or employed, personal knowledge about the specific facts at issue in this case, such as, for example, personal knowledge of the layout of the farm, or the amount of traffic that passed daily on the roads near it. To the contrary, the defendant's contention on appeal is that the trial judge used personal knowledge about farm operations in southern Illinois *in general*. Unlike in *Dameron*, in the present case, also as explained above, there is no allegation that the trial judge conducted his own investigation related to this case—such as, for example, consulting outside sources such as internet satellite images of the layout of the farm—rather than relying on preexisting general personal knowledge about farming in southern Illinois. Thus, the authority presented to this court by the defendant is not apposite to the facts of this case and does not persuade us that error occurred in this case.

¶ 47 Moreover, even if we were to assume, *arguendo*, that the doctrine of invited error is not applicable in this case, and were to further assume, again *arguendo*, that the trial judge erred in

24

considering his own preexisting, general knowledge of farming practices in southern Illinois when finding that the defendant's testimony was not credible, we agree with the State that the defendant has not demonstrated the prejudice necessary to prevail on his claim in this case. See, *e.g.*, *People v. Gleash*, 209 Ill. App. 3d 598, 609 (1991) ("Although a defendant may be denied due process of law when the [trial judge] makes a decision based upon a private investigation [citation], the error, even of constitutional dimension, is rendered harmless if the evidence overwhelmingly favors conviction."). The evidence of the defendant's guilt in this case was overwhelming. First, portions of the defendant's testimony at his bench trial were either inherently incredible or simply nonsensical. For example, despite his testimony that he had lived "[a]ll of" his life on or around the farm in question, he could not testify with specifity as to how many outbuildings there were at various places on the farm. When asked about outbuildings near the house the defendant lived in at that time, the defendant testified, "there's the old chicken coop and the crib and the garage and then an old barn, and then there's what they call the laying area where the chickens used to lay the eggs, so that would be one, two, three, four, five—*five buildings—six maybe*." (Emphasis added.) When asked about outbuildings near the house his mother and father lived in at the time, the defendant testified, "there's the old machine shed, the new machine shed, and then several bins. *I'd have to count them up.*" (Emphasis added.) When asked about outbuildings near the house the defendant's brother lived in at the time, the defendant testified, "Around my brother's is just basically nothing but old cars and stuff like that, *maybe one outbuilding or two*." (Emphasis added.) In addition, on cross-examination, the defendant offered the rather head-spinning assertion, with regard to A.H., that "I probably *was alone with her*, but, I mean, if I was, it was not in a building or at her house or anywhere *by myself with her*." (Emphases added.) In light of the trial judge's explicit finding that all of the State's witnesses were credible, and the credibility problems that existed with the defendant's testimony even notwithstanding the trial judge's own personal

knowledge about farming practices in southern Illinois in general, the evidence against the defendant was overwhelming. We do not believe, in light of this factual posture, that any chance of acquittal existed, at all.

¶ 48   Indeed, even if one were to ignore the foregoing problems with the defendant's testimony, and were to accept, *arguendo*, the premise that underpinned much of the defendant's testimony— that it would have been difficult for the defendant's sexual assaults of A.H. to have occurred as A.H. alleged—the State is correct that "difficult" does not mean "impossible," and based upon the charges of which the defendant was convicted with regard to A.H., the trial judge was required to find that only four of the many, many alleged assaults occurred over the four-year span in question: one assault during which the defendant placed his penis in the vagina of A.H. (count I), one assault during which the defendant placed his penis in the mouth of A.H. (count II), one assault during which the defendant knowingly fondled the breasts of A.H. for the sexual gratification of the defendant (count III), and one assault during which the defendant knowingly fondled the genitals of A.H. for the sexual gratification of the defendant (count IV). Thus, even if the trial judge believed the defendant's testimony and agreed with the defendant's theory that it would have been difficult for the assaults to have occurred as alleged, if the trial judge also believed A.H.—which he expressly stated that he did—then he still would have found the defendant guilty, especially where, as here, the defendant never denied that the assaults happened.[2]

¶ 49   With regard to the error raised by the defendant regarding his sentencing hearing, even if we assume, *arguendo*, that, based upon the case law presented by the defendant, it was error for

_____

[2]In making this observation, we do not shift the burden of proof to the defendant; we merely point out that if testimony from the defendant—who chose to testify at trial—existed that directly contradicted A.H.'s testimony that the events occurred, then it would follow that the trial judge could not believe both A.H. and the defendant with regard to that point. Such testimony does not exist, and therefore the trial judge could have believed everything the defendant testified to, and everything A.H. testified to, and still found the defendant guilty of the four counts related to A.H.

the trial judge to consider the statements of T.H. and L.M. as the judge fashioned the sentences in this case, we conclude that the defendant has not demonstrated that he was unduly prejudiced thereby. See, *e.g.*, *People v. Richardson*, 196 Ill. 2d 225, 232-33 (2001) (defendant's right to due process of law is violated if victim impact statements become so unduly prejudicial that it renders the sentencing proceedings fundamentally unfair). The defendant repeatedly asserts on appeal that the prejudice he suffered lies in the fact that the trial judge used the statements of T.H. and L.M. as the trial judge's reason for not finding that the defendant had lived a law-abiding life for a substantial period of time, despite his lack of a criminal history. However, as described above, what the trial judge actually stated about his findings was the following:

"I can make the finding that he has no official history of delinquency or criminal conduct because you don't. However, I'm not going to make the finding that you have led a law-abiding life for a substantial period of time because I have heard from other people here today as part of the victim impact statements that you have molested them, *as well as* the fact that these allegations against you, for which you have been found guilty, are alleged to have occurred over a long period of time, so I can't make that—that part of that finding." (Emphasis added.)

¶ 50    Thus, even if the statements of T.H. and L.M. had not been considered—indeed, even if they had never been presented to the trial judge—the trial judge's other stated reason for his finding, which was that the crimes for which the defendant was convicted took place "over a long period of time," is uncontested by the defendant on appeal, is undeniably true, and provided a sufficient basis, by itself, for his refusal to make the finding requested by the defendant. In fact, under these circumstances, no reasonable trial judge could have concluded that the defendant had lived a law-abiding life for a substantial period of time. Even setting aside the statements made by T.H. and L.M., the defendant's lapses in adhering to the criminal laws of Illinois were certainly

27

not a recent, one-time occurrence, and could not reasonably be argued as such, as the evidence at trial demonstrated, beyond a reasonable doubt, that the defendant actively broke Illinois law on at least six occasions, beginning in 2003 and concluding in 2016. Moreover, as the above quote demonstrates, the State is correct in its assertion on appeal that the trial judge *did* find that the defendant had no official history of delinquency or criminal conduct. Under these circumstances, we find no error in this case that unduly prejudiced the defendant to the extent that it rendered the sentencing proceedings fundamentally unfair (see *id*.), and accordingly we conclude there is no reason to remand for new sentencing.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 53    Affirmed.